HULSE et al. v. BONSACK MACH. CO.

BONSACK MACH. CO. v. HULSE et al.

(Circuit Court of Appeals, Fourth Circuit. February 5, 1895.)

No. 108.

1. UNREASONABLE CONTRACT—PUBLIC POLICY.
The B. Co., which was engaged in constructing, operating, and selling machines for making cigarettes, entered into a written contract with H., by which it employed him at a salary of $50 per month, to be afterwards increased, to set up and operate its machines, and by which it was agreed that H. should do all in his power to promote the interests of the company, and that in case he could make any improvement in the machines, either while in the company's employ or at any time thereafter, the same should be for the exclusive use of the company. The last provision was stated to H. to be a condition precedent to the making of any contract, the company having previously suffered from its employés making improvements and selling them to rivals. *Held*, that the contract was not unreasonable or unconscionable, nor contrary to public policy.

2. SAME—CONSIDERATION.
*Held*, further, that the contract was an entire one, and neither it nor any part of it was without consideration.

Appeal from the Circuit Court of the United States for the Western District of Virginia.

This was a suit by the Bonsack Machine Company against W. A. Hulse and R. H. Wright to enjoin the assignment of a patent. Upon the hearing in the circuit court, an injunction was granted, and the cause was referred to a master, to ascertain what would be proper compensation to be awarded to defendants under an agreement by plaintiff to make such compensation (57 Fed. 519). Upon the coming in of the report, a final decree was entered, awarding $8,126.36. Both parties appeal.

These are cross appeals from the circuit court of the United States for the Western district of Virginia. The Bonsack Machine Company is a corporation whose business it is to construct, operate on royalties, lease, and sell machines for the manufacture of cigarettes, in this and many other countries. Its principal machine is known as the "Bonsack machine." By perfecting it, and procuring and purchasing patents connected with it, the company has acquired and is doing a large business. In the course of its business the company engages many persons to operate its machines. In several instances persons so employed discovered improvements in working them, and, without disclosing the discovery, took out patents, which they used or sold in competition with the company. To avoid this in the future, the company adopted a rule by which it required all persons entering its employment to agree to give the company the benefit of any improvement made while in the employment of the company, or at any time afterwards. Wright, one of the defendants, was a large stockholder in the company, and its general manager, with an interest in its transactions outside of this country. Hulse had been working at his trade as a mechanic, realizing between four and five hundred dollars a year. On or about 19th July, 1886, he applied for employment in the Bonsack Company. In his interview with the president of the Bonsack Company, at which his application was granted, he entered into a written contract, the provisions of which were explained to him, especially that relating to any improvements which he might make in cigarette machines. Of that provision he expressed his approval. The contract will be set out hereafter. Having thus been engaged, he served the company at an increasing salary, beginning at $50 per month, then $60, again $75, and afterwards $85 per month. In July, 1889, while employed by the company in

Montreal, his health failed, and he ceased to work with it. In the fall he applied to the company for work, and the president of the company got him a place under Wright, who was engaged in the introduction and sale of the Bonsack machines in Oriental countries. Under the agreement between Wright and the company, all the business expenses attending his management were charged against the profits of the business before the net profit was divided. Hulse received from $100 to $125 per month and expenses. Being so engaged, introducing, operating, and selling Bonsack machines under Wright, Hulse, while in China, saw a French machine, which put him upon the idea of an improvement in the Bonsack machine, by which a crimping device could be substituted for paste in the process of making cigarettes by machinery, and made a model or first design of it. On his return to this country he communicated to the company the fact that he saw an opportunity for an improvement. Thereupon he was furnished by the company with a suitable room, power, and materials to continue his experiments, and to perfect his idea. While so employed, however, he did not draw any salary from the company. The experiments continued some three or four months. On 19th March, 1892, Hulse, with Wright, to whom he assigned a half of his invention, wrote to the company offering to sell to it the device and the patents which Hulse expected to obtain for the improvement for $100,000. To this letter they received a reply refusing to purchase, the company claiming and insisting on its rights under the contract with Hulse, and declaring that it was the purpose of the company not only to pay Hulse for services rendered, but also to pay him what the company regard liberal for his improvement if it should prove to be valuable to the company. After the receipt of this letter, Hulse and Wright did not insist upon their offer, but Wright, in writing to the secretary of the company, said: "We will push forward the crimping device as fast as possible, under the assurance of your board as to your liberality in case we make a success of it." Hulse went on with his experiments, and very soon afterwards tried to sell the improvement to a rival company. Thereupon a bill for an injunction was filed in the state court of Virginia, and a temporary injunction was granted, restraining Hulse and Wright from assigning the improvement or any patent therefor. The cause was removed into the United States court, and a motion to dissolve the injunction was refused, but the injunction bond was increased from $10,000 to $50,000. The case coming on for final hearing, the injunction was made perpetual, and a reference was ordered to inquire what would be a liberal compensation to Hulse and Wright for their services and expenses in connection with perfecting the device and securing patents therefor. The master reported that the expenses of Hulse and Wright should be paid by the Bonsack Company, and that each of them be paid at the rate of $5,000 per annum for the time they were engaged on this improvement,—in all $8,126.36. The report was confirmed. The improvements, by final decree, were declared to be the property of the Bonsack Company. Hulse and Wright were ordered to convey to the Bonsack Machine Company all the interest they have in these improvements, or any letters patent for the same; all expenses to these ends to be borne by the Bonsack Company. The injunction was made perpetual. Both parties appealed, the complainant because of the amount awarded to Hulse and Wright, the defendants because of the decision on the merits and the small amount of the award. The case was heard in this court on the errors assigned.

A. H. Burroughs and Samuel A. Duncan, for plaintiff.

F. H. Busbee and George H. Graham, for defendants.

Before SIMONTON, Circuit Judge, and MORRIS and BRAWLEY, District Judges.

SIMONTON, Circuit Judge (after stating the facts). The contract between the Bonsack Machine Company and Hulse is in these words and figures:

"That the said company has this day employed the said Hulse to set up and operate its cigarette machines at a salary of $50 for the first month, and

$65 per month thereafter, with such advance of salary, up to not exceeding $75 per month, as the services of the said Hulse may justify. It is agreed that the said Hulse will serve the company wherever desired, the company to pay his railroad fares whenever traveling at the request of the company. No abatement will be made for loss of time because machines are not kept running, nor any extra payment for extra hours. The said Hulse agrees to do all in his power to promote the interests of the said company, and in case he can make any improvement in cigarette machines, whether the same be made while in the employment of the said company or at any time thereafter, the same shall be for the exclusive use of the said company. And it is agreed that in case the said Hulse be not able to serve the said company efficiently, or shall in any way neglect his duty. the company may stop his services at any time, paying up to such time; but, in case the said Hulse desires to quit the said company, he shall give sixty days' notice thereof."

After this contract was made, and upon the offer of Wright and Hulse to sell the improvement to the company, the following correspondence ensued:

"We herewith inclose you a copy of the contract between this company and Mr. Hulse. Without waiving any of our rights under the said contract, but insisting and relying on the same, we will say that it is our purpose not only to pay Mr. Hulse for actual services rendered, but also to pay him what we regard as liberal for his improvement, provided it proves valuable to our company by reason of its being perfected, and letters patent be obtained covering the same, which are of proper scope and valid. As to the value of the supposed improvement which Mr. Hulse has made we do not know, nor do we know to what extent the device may infringe other patents. It is our purpose to investigate these matters. We very much hope that the devices will meet Mr. Hulse's expectations, and that they do not infringe any existing patents.

"Very truly yours,　　　　　　　　　　　　　D. B. Strouse."

Two days later (March 21, 1892), Wright, having meanwhile conferred with the inventor, Hulse, and speaking for Hulse as well as for himself, wrote to the secretary of the Bonsack Company, saying, among other things:

"I wish it distinctly understood that we will push forward the crimping device as fast as possible, under the assurance of your board as to your liberality in the matter, if we make a success of it."

The questions made in the assignments of error are these: (1) What was the contract between the company and Hulse? Is it divisible, consisting of independent covenants? And is it, or any part of it, without consideration? (2) Is it an unconscionable or unreasonable contract? (3) Is it void as against public policy? (4) Is the amount reported by the master a just and reasonable compensation?

The contract: It is a contract of employment made after an explanation of its terms by one party and the approval of them by the other. No question is made here impugning the bona fides of the contract. The consideration moving from the company is the employment of the services of Hulse at a progressive salary, with no abatement for loss of time and no extra payment for extra hours, all railroad fares of Hulse when traveling for the company to be paid. In consideration of these stipulations, Hulse is to serve the company wherever desired, agrees to do all in his power to promote the interests of the company, and in case he can make any improvements in cigarette machines, either while in the employ of the company or

at any time thereafter, such improvements are to be for the exclusive use of the company. This last provision was stated to him as a condition precedent to his employment, was approved and consented to by him. Here we have a contract of hiring at stipulated prices, and a contract of service, with one detail of the service inserted to prevent any misunderstanding. It would seem to be an indivisible contract. The stipulation claimed to be an independent covenant, directed to any improvements made by him in cigarette machines, was the very stipulation which secured the contract on the part of the company to engage and pay Hulse. The consideration on the part of the company moves to all the parts of the contract. The contract was one of employment. The company was to do certain things. In return, Hulse was to do certain things,—set up and operate the cigarette machines, and promote the interests of the company, and, to do this, give them the benefit of improvements in cigarette machines in case he made any. Can it be said that, if he set up and operated the machines, he had exhausted the consideration of his contract, and that he could antagonize the interests of the company whenever he pleased, his agreement to promote its interests being nudum pactum? For similar reasons, it cannot be said that this agreement, or any part of it, is without consideration. In the absence of fraud, mistake, illegality, or oppression, and where no relations of trust and confidence exist between the parties, courts cannot inquire into the inadequacy of the consideration of a contract, or set up their own opinions respecting that which parties in good faith on both sides have agreed upon. "If there is one thing more than another that public policy requires, it is that men of full age and competent understanding shall have the utmost liberty of contracting, and that contracts, when entered into fully and voluntarily, shall be held good, and shall be enforced in a court of justice." Registering Co. v. Sampson, L. R. 19 Eq. 465. Some consideration is requisite to support a contract, but the sufficiency of the consideration cannot be inquired into. 1 Sedg. Dam. 455.

Is this contract unreasonable or unconscionable? The Bonsack Machine Company owned valuable patented machines, employed in the manufacture of cigarettes. Comparatively the invention was in its infancy, and the machinery was known to be difficult of operation, and open to improvement. Any one entering into the employment of the company had full opportunity of learning the merits of the machines, and, by constant and daily use, could see where the machine was defective, and where improvement was needed. If any improvement suggested itself to his mind, he could, by using the machine and the time and material of the company, experiment upon it, and ascertain its value. The improvement would be his own idea. But it owed its suggestion and origin, its progressive development and perfection, to the business, the practical working, the opportunity afforded by the company. When, therefore, the company, taught by costly experience, determined to protect itself from the discovery of improvements by its own servants, it did a natural and reasonable thing; and, when it protected itself by a covenant in advance of any employment with those seeking its serv-

ice, it did a fair thing. Nor was that part of the contract which put in the same category improvements made while in the employment of the company and those made at any time thereafter unconscionable or unreasonable. Without this safeguard, the contract on this point could be easily evaded, and be made valueless. It will be observed that Hulse did not bind himself to study and seek out improvements in this machine, and, when discovered, to give them to the company, as other employés, who were witnesses in the record, did. His contract was in effect that if, in his experience with the machines, derived in the service of the company, he saw or was led to see improvements, they were to inure to the benefit of the company. And his inventive genius or power of observation could only belong to the company when applied to cigarette machines; all other fields of invention were open to him. The contract does not appear unreasonable. Nor can it be said, in the light of this record, with respect to the subject-matter of this suit, that the action of the complainant is unconscionable. The argument is that for a certain monthly stipend, worth no more than the daily services rendered, the complainant seeks to secure any discovery or invention in cigarette machines Hulse may make in his whole life. But this is answered by what took place. Hulse, fearing this, or having had it suggested to him, sought to be absolved from his contract; that is, sought to secure the improvement for himself and his partner, and not for the company, and demanded $100,000 from the company for it. The company, insisting on its rights, nevertheless, declared its intention to pay him what it regarded a liberal reward for the improvement, provided it had a value. With this Hulse receded from his demand, and went on with the work, relying on this declaration. We may treat this declaration simply as the purpose of the company to deal liberally with Hulse if his scheme was a success, and not to hold him or themselves to the letter of the bond. If so, it cannot be said, so far as the subject-matter of this suit is concerned, that Hulse has cause of complaint. His services were recognized, and, if successful, would be liberally rewarded, notwithstanding the terms of the contract. Or we may treat this declaration as a modification of the contract. If so, then it cannot be said to be unconscionable, for it satisfied Hulse as well as Wright, who seems to be a business man keenly alive to his own interest.

Is the contract void as against public policy? Does it injure the public? Here we have the case of an ingenious man, without opportunity of developing his talent, and struggling under difficulties, enabled by this contract to secure employment in a large and prosperous corporation, where he could give his inventive faculties full play. He in this way was afforded every opportunity of discovering and removing defects in cigarette machines. He secured this employment by signing this contract. He could not have obtained it if it had been understood that this contract had no validity. Then, in all human probability, the public would have lost the benefit of his discovery. In this point of view, a contract of this character cannot be said to be against public policy. Sir George Jessel, in discussing the subject, holds that not only is there no rule of

public policy against such a contract as this before us, but that public policy is with it.    Registering Co. v. Sampson, L. R. 19 Eq. 466.    It has been urged with learning and ability that this contract is void as against public policy, because in restraint of trade.    It would extend this opinion to an unreasonable length if we attempted to follow the long line of authorities on this subject found in the English Reports from the Year Books to the present time.    The true test is that made by Tindal, C. J., in Horner v. Graves, 7 Bing. 735: "Is the restraint such only as to afford a fair protection to the interest of the party in favor of whom it is given, and not so large as to inter-fere with the interests of the public?"    Or, to put it as it is put in Am-munition Co. v. Nordenfelt [1893] 1 Ch. 630, and in Match Co. v. Roe-ber, 106 N. Y. 473, 13 N. E. 419:    Is it, in view of all the circumstances of the case, reasonable?    We have seen the reason for the adoption of this form of contract by the company.    It was to protect it from improvements discovered by its own servants, under its pay, in cigarette machines.    The company lets them into an intimate knowledge of its cigarette machines, affords them the opportunity of discovering any needed improvements in them, gives them at hand the means of testing any improvements which may suggest them-selves.    Naturally it seeks to protect itself from an abuse of these results.    The protection sought is a fair one for the interests of the company.    Does this protection interfere with the interests of the public?    "Sales of secret processes are not within the principle or the mischief of restraints of trade at all.    By the very transaction in such cases, the public gains on the one side what is lost on the other, and, unless such a bargain was treated as outside the doctrine of general restraint of trade, there could be no sale of secret pro-cesses of manufacture." Bowen, L. J., in Ammunition Co. v. Nordenfelt, supra.    In Morse, etc., Co. v. Morse, 103 Mass. 73, the court refused to extend the doctrine of restraint of trade to a covenant in an assign-ment of a patent by an inventor "to use his best efforts to invent im-provements in the process, and to transfer them to the buyer; to do no act which may injure the buyer or the business; and at no time to aid, assist, or encourage in any manner any competition against the same."    Speaking of this doctrine. the court says:    "It has never been extended to a business protected by a patent.    Nor does it extend to a business which is a secret, and not known to the public, because the public has no right in the secret."    This is not literally an agreement in restraint of trade.    It is simply a contract, which, by analogy, can be likened to one, and the analogy should not be pushed beyond the reason for it.    There is no presumption that such a contract is void.    The presumption is in favor of the competency of the parties to make the contract, and the burden is upon the party who alleges that it is unreasonable or against public policy.    In the most recent cases the validity of contracts in partial restraint of trade is tested, not by any inflexible rule, but by their reasonable-ness when considered in connection with the protection necessary for the particular business and the modern methods of conducting the enterprise.    The contract in this case has reference, not to all inventions which Hulse might discover, but only to improvements

in cigarette machines; and the question is not whether a court of equity would compel specific performance if Hulse had conceived the invention after he had severed his relations with the company, and at a time when it did not result directly from the opportunities of his employment, but whether the court should do so in this case, where the invention was conceived while he was in the company's service, and perfected with its direct assistance, and in a case where Wright, the other party interested with him, was an agent and business manager of a department of the company's business. The case presents circumstances and elements calling for the exercise of this equitable remedy. We concur in the conclusion reached by the circuit judge in his opinion in this record:

"The public, in so far as questions relating to public policy are concerned, has no interest in this matter. Should the claim of the Bonsack Machine Company fail, the public would have no right to use the improvement. The device would then belong to Hulse, would be his secret, protected by patent, and guarded from the public use by provisions of law. The restraint provided for in the contract does not interfere with any interest of the public, and it only gives a fair protection to the party in whose favor it is given, for which proper compensation was stipulated for the party making it."

The last assignment of error is the amount found by the master, and allowed by the court. The question was, what compensation should, under the circumstances, be allowed? The Bonsack Company had declared that the compensation would be liberal. The deserving party was Hulse, and the compensation was really his. Wright deserved nothing. He was only a speculator, seeking share of Hulse's reward. Hulse voluntarily, or for considerations which he considered adequate, agreed to divide with him. When, therefore, the master awarded the gross sum of $8,126.36, this was his finding of what would be a liberal compensation for Hulse's service in and about the improvement. We see no error in this of which either party can rightly complain.

It is ordered that the decree of the circuit court be affirmed in all respects, each party paying its own costs in this court.