WESTINGHOUSE AIR-BRAKE CO. v. CHICAGO BRAKE & MANUFACTURING CO. et al.

(Circuit Court, N. D. Illinois.    March 7, 1898.)

1. PATENTS—ASSIGNMENT—FUTURE IMPROVEMENTS.
    The Park patents, Nos. 554,086, 543,102, 555,877, and 573,790, for improvements in air brakes for railway trains, are improvements on his patent No. 393,784, so as to be included in an assignment made by him of the latter patent and any future "improvements" thereon to be made by him.

2. SAME—ASSIGNMENTS OF FUTURE INVENTIONS—PUBLIC POLICY.
    A contract assigning a patent, and all future improvements thereon to be made by the patentee, is not against public policy, though it binds the inventor to assign, for a consideration already paid, inventions made many years thereafter.    Littlefield v. Perry, 21 Wall. 226, and Manufacturing Co. v. Gill, 32 Fed. 697, followed.

3. SAME.
    A contract to assign a patent, and all future improvements thereon, will be enforced as to patents for such improvements, as against assignees thereof who take with knowledge of the contract or with notice sufficient to put them on inquiry.

**4. SAME—SPECIFIC PERFORMANCE.**

A decree for specific performance of a contract to assign a patent and all future improvements thereon may be so conditioned as to require complainant himself to do full justice by reimbursing defendant for all his outlays in perfecting such improvements and procuring patents therefor, and also by paying him a reasonable per diem, measured by what his services would have commanded in other fields, such as expert and mechanical witness, etc.

Millard & Abbey (L. L. Bond, of counsel), for complainant.

Samuel E. Hibben (Robert H. Parkinson, of counsel), for defendants.

GROSSCUP, District Judge.    The bill in this case is to compel the defendant H. S. Park and his assignees to specifically perform his written contract to convey to the complainant his interest in letters patent Nos. 554,086, 543,102, 555,877, and 573,790, issued by the United States, either to Park or to his assignees. The agreement relied upon by the complainant is evidenced by two written papers, one being an assignment, both of which were executed by Park in connection with the sale by him to the complainant of 13 patents relating to railway brakes; and also of four applications already prepared, and of three applications in process of preparation, all relating to the same subject-matter. The memorandum of agreement, executed on the 18th day of October, 1889, recites that Park would sell, and "by instruments assign, all said patents to said company, as also all pending applications, and said applications in process of preparation, and the inventions therein severally described, or intended so to be, and also all improvements heretofore or hereafter made by him relating in any way to railway brake mechanisms or operations." The other paper, the assignment proper, executed on the 19th day of the same month, after reciting the patents and applications sold, proceeds:

"As also in and to any improvements thereon made by me, or which I may hereafter make thereon, the same to be held and enjoyed by the said Westinghouse Air-Brake Company for its own use and behoof, and for the use and behoof of its legal representatives, to the full end of the term for which said letters patent are granted."

The consideration received by Park was $35,000 in cash and some advantages in other matters.

In the view I have taken, it is unnecessary to determine the scope of the first-mentioned agreement, or the extent to which it is validly operative.    I base my conclusions upon the contract liability of Park as embodied in the latter paper, or the assignment proper.

The first inquiry is, do the inventions, for which a compulsory assignment is asked, rightfully fall within the meaning of the parties to the contract under the designation of improvements upon the inventions theretofore conveyed?    This is, to some extent, a question of law, but more largely a question of fact.

It is unnecessary to enter in detail into the history of the development of operative air brakes, and their successful application to the useful purposes to which they are now put.    George Westinghouse, Jr., has, by the common consent of mankind, as well as by the judgment of the courts, been awarded the first place in the promotion of this useful purpose.    Westinghouse v. Air-Brake Co., 59 Fed. 596; Westinghouse

Air-Brake Co. v. New York Air-Brake Co., 11 C. C. A. 528, 63 Fed. 962. Perhaps the best evidence that he holds such place rightfully is to be found in the fact that his devices, with their incidental improvements, are the only ones in successful operation everywhere.

The earliest practical air brake—protected by patent granted to Westinghouse in 1869—consisted of a pump operated from the engine, which compressed air into a reservoir under the engine. From this reservoir a train pipe extended backward, under the cars, tapped by a branch pipe under each car, communicating with the forward end of a cylinder containing a piston whose action set or unset the brakes. Between the train pipe and the reservoir under the engine was a cock or valve, readily manipulated by the engineer, which, when the brakes were to be set, was opened by the engineer. This action gave port to the compressed air in the reservoir, which, following back through the pipe, reached in turn the branch pipe, and through them the heads of the piston, pushing them backward, and thus forcing the brake shoes against the wheels. When the engineer wished to release the shoes, he so shifted the valve as to, at once, shut off the flow of compressed air, and to open the port leading from the main pipe to the atmosphere. The pressure on the pistons being thus removed, the pistons were forced back by means of springs, thereby unsetting the brakes. This invention, though containing the germ of the present operative air brakes, was, in fact, very imperfect. It was soon improved upon by what was known as the automatic brake, patented by Westinghouse in 1873. In this device a reservoir was placed under each car, and connected with the main pipe and the brake cylinder by what was known as a triple valve. The difference between this device and its predecessor is thus described by Judge Townsend (Westinghouse v. Air-Brake Co., 59 Fed. 583):

"In the former the compressed air was stored in the main reservoir until required for the application of brakes; in the latter the main and auxiliary reservoirs and train pipe were always charged with compressed air at working pressure, to prevent the application of the brakes. When the engineer wished to apply the automatic brake, he shifted the engineer's valve so as to cut off the flow of air from the main reservoir, and open a port from the train pipe to the open air. The effect of this was to reduce the air pressure in the train pipe, and cause a back pressure from each auxiliary reservoir through the triple valve, which shifted it so as to close the port from the branch pipe to the train pipe, and to stop the flow of air from the auxiliary reservoir; to close the port leading from the brake cylinder to the open air; and to open the port leading from the auxiliary reservoir, and connect it with the port leading from the brake cylinder. Thereupon the compressed air in the auxiliary reservoir flowed into the brake cylinder and applied the brakes. It will thus be seen that, while the former system was operated by pressure from the main reservoir, the latter was operated by withdrawal of pressure."

It will thus be seen that in the earlier device the engineer set the brakes by turning on the air from the reservoir under the engine; in the second device, the brakes were set either by the engineer, or by any occasion that shut off the air from the main reservoir. In the earlier device, the breaking of the train pipe, either by severance of the train or by accident to the hose itself, freed the cars thus cut loose from any

pressure from the compressed air; in the latter device, such a breakage instantly subjected them to the pressure of the air from the auxiliary reservoirs that instantly set the brakes. Many accidents were thus, by the second device, made preventable, and the whole train much more certainly subordinated to the dominion of the air-brake system.

But even these improved devices fell short of perfect success. Especially was this true in their application to long trains, where a considerable lapse of time necessarily accompanied the transmission of the force from the first to the last car. This imperfection led, in 1888, to Westinghouse patent No. 376,837, wherein was introduced, for the first time, appliances that, in the language of Judge Townsend, furnished the following requirements:

"(1) The regulation of the force to be applied to the brake shoes, so as to secure all necessary gradations, from the mere slackening of speed to the service stop, and from the service stop to the emergency stop; (2) the automatic operation of the brakes in case of accident; (3) the practically simultaneous operation of the brakes on each car, so that, in long trains of freight cars, shocks might be avoided; (4) the control of all these operations by the engineer; (5) certainty of operation under all conditions. * * * The quick-action element only is called into action for emergency stops. This emergency action is secured in the patent then under consideration by means of a separate supplemental piston and valve in a supplemental valve chamber below the main slide valve of the triple-valve device. This chamber connects the train pipe with the brake cylinder, communication between them being regulated by the supplemental valve, opening outwardly or downwards, and a check valve, opening inwardly or upwards. These valves are held upon their seats, under ordinary conditions, by a spring bearing upon their stems. In the bushing which forms the valve face of the main slide valve are four ports governed by said slide valves. One of these ports leads to the brake cylinder, two lead to the supplemental valve chamber on the upper or inner side of the supplemental piston, and one leads to an exhaust port. When an emergency stop is to be made, the engineer throws his engineer's valve wide open, thereby causing a sudden and material reduction of pressure. The excess of auxiliary reservoir pressure then forces the main piston stem against the said other stem, overcoming the tension of its spring, drives the main piston to the extreme limit of its stroke, and thereby uncovers the ports leading from the auxiliary reservoir to the supplemental valve chamber. This pressure drives the supplemental piston outwardly or downwards, against the stem of the supplemental valve, and forces it from its seat. Thereupon the preponderance of train pipe pressure in the brake pipe opens the check valve, and the air from the train pipe rushes directly from the brake pipe to the brake cylinder. The result of this operation is twofold. It hastens the application of the brakes on the car on which it is operated, and, by venting the train pipe, it hastens a similar reduction of pressure, and consequent similar operations in the next successful triple-valve device on the next car. The release of the brakes is accomplished by the admission of air from the main reservoir."

It will thus be seen that the quick action in setting the brakes is obtained by the introduction of additional pressure from the auxiliary reservoir under each car.

Patent 393,784, conveyed by Park to the complainant, had the same general function, namely, the re-enforcement of pressure upon the brakes in case of emergency; but it differed from the device as embodied in patent No. 376,837, in obtaining this additional pressure directly from the train pipe instead of from the auxiliary reservoir. In each case the valve mechanism, introducing the additional pres-

sure, was encased separately from the ordinary triple valve, but, in each case, the force applied was in conjunction with the triple-valve mechanism. Patent 543,102 typifies the idea embodied in Park's later patents,—the ones that are the subject-matter of this suit. Instead of having a separate or auxiliary valve mechanism, through which air pressure from the train pipe is communicated to the brake cylinder, the whole is so constituted that a single-valve mechanism performs the necessary function in both service and emergency stops. The mechanisms of the earlier patents are in this later patent consolidated. Is the change wrought an improvement only; or is it a departure along lines essentially independent?

The controlling purpose of both the Westinghouse patent and Park assigned patents was the better regulation of service stops, as also, in case of emergency, to obtain a mechanism whereby the ordinary air pressure could be re-enforced. Westinghouse, it is true, obtained the additional pressure from the auxiliary reservoirs; Park, from the train pipe. But the purpose of each device was the same. The several functions of the valve mechanisms were the same, except that they introduced the pressure into the brake cylinder from different sources. The later Park inventions—the ones involved in this suit—had the same purpose, and the valve mechanisms performed the same functions. In these, as in the earlier, the air introduced was drawn directly from the same source of supply. They occupy—these Park inventions, early and late—precisely the same field, both in purpose and in the functions of the mechanism employed. They differ only in mechanical structure. Even in mechanical structure, these earlier and later Park inventions are very similar. The later are the natural and progressive outgrowth of the earlier. The mechanical thought embodied in the earlier unquestionably gave birth to the conception involved in the later. They are, in every feature, in the direct and natural line of mechanical ascent.

But, were they much more dissimilar, such fact would not change my conclusion. Identity of purpose and function of the two mechanisms controls the question whether the one stands in the relation of an improvement to the other. Dissimilarity of the mechanical means employed to reach the purpose, or perform such function, only measures the merit and character of the improvement. Park may, in his later invention, in the narrow sense of particular arrangement and adjustment of valves, have started out on new lines; but, in the broader idea that dominates these air-brake devices, he remained, in 1895, precisely where he was in 1888. In the later patents he only perfects, in mechanical details, the fundamental conception upon which his former invention was built. The two groups of inventions, in my judgment, stand indisputably, in the relation of consecutive mechanical growth,—in the relation of an imperfect machine, somewhat perfected. In every view of the meaning to be given to the word "improvements" as used in the assignment, I can find nothing that fairly excludes these later inventions.

Concluding, thus, that the assignment of the inventions involved in

this suit is within the contract obligation of Park, as evidenced by the written paper of October 19, 1889, the inquiry recurs, is such contract obligation rightly enforceable in equity? The original invention, and those I have just found to be improvements thereon, are separated from each other by an interval of seven years. During that interval no relation of employer and employé existed between the parties. Park retained in the original arrangement no right to royalties. Indeed, he retained no connection with either the patents or the parties that would yield him any future recompense. The consideration for which he had parted with all his interest in the inventions, as also the improvements thereon, was already fully paid. It is not shown that the later inventions—those now sought to be recovered—had yet been conceived. Here, then, is a contract upon the part of Park, thenceforth a stranger to the patents and the parties, requiring him to convey, without further recompense, any improvements he may thereafter conceive upon the devices already conveyed. It is easy to see that his incentive to proceed in that line of thought and mechanical development would, in the belief of the enforceability of such contract, be greatly lessened, if not entirely lost. Is a contract, with such consequences upon the inventive activities, so clearly against public policy that the courts will refuse to give it enforcement?

The leading case touching this question is Littlefield v. Perry, 21 Wall. 226. In that case Littlefield, the patentee of a coal burner, on the 5th of April, 1853, granted to Treadwell & Perry all his right, title, and interest, for certain restricted territory, to the inventions, improvements, and patents, or any improvements thereon, that might be secured to him by letters patent dated 1851, or by an application then pending in the patent office of the United States for a patent, upon a certain improvement on the invention so as aforesaid patented by him. The pending application referred to in this grant was subsequently withdrawn, and a new application substituted, which resulted in a patent, January 20, 1854. The question of fact was whether the invention embodied in the patent of January 20, 1854, was or was not, within the meaning of the parties to the grant, an improvement upon the patent of 1851 and the pending application referred to in the grant. The court held that it was such an improvement, and, in stating the law applicable thereto, said:

"The assignment in this case, by its express terms, covers all improvements in the original patent or the invention described in the application of 1852. It carried with it the legal title to the existing patent. If one had been issued upon the application, that, too, would have been inured to the benefit of the assignee, because in that case it would have been the assignment of a perfected invention. Without considering whether the invention upon which the patent of 1854 issued was not, in fact, the same to all intents and purposes as that of 1852, it is sufficient for the purposes of this case that it was an improvement upon it, or perhaps, more properly, that invention perfected. An assignment of an imperfect invention, with all improvements upon it that the inventor may make, is equivalent in equity to an assignment of the perfected results. The assignment in this case being such a one, the assignees became in equity the owners of the

patent granted upon the perfected invention; that is to say, of the patent of 1854. Littlefield took the legal title in trust for them, and should· convey. Courts of equity, in proper cases, consider that as done which should be done. If there exists an obligation to convey at once, such courts do oftentimes proceed as if it had actually been made. * * *"

The case discloses a transaction in which the patentee in all probability had already in mind, when the assignment was executed. the devices subsequently patented; and in that respect, as in some others, is different from the case under consideration. But the language employed by the court seems as applicable to the one case as to the other. The decision is, in no sense, rested upon the fact that the inventor had, at the time of the grant, already conceived the future offspring. That distinction was earnestly pressed upon me by counsel for the defendants, but I do not see that it found its way into the written reasoning of the court.

Manufacturing Co. v. Gill, 32 Fed. 697, decided by Mr. Justice Bradley at circuit, who at the time of Littlefield v. Perry, supra, was already a member of the supreme court, throws light upon that decision, as well as upon the abstract question in hand. The case was one for infringement of letters patent issued to Aspinwall, December 14, 1880, and was defended, among other things, upon the ground that the defendants were part owners of the invention sued upon. It seems that, in 1869, Aspinwall obtained letters patent for a potato planter, which, on the 15th January, 1870, he assigned to 11 persons, the interests of 8 of whom came by mesne conveyances to the defendant Gill. The assignment of January 15, 1870, embraced the words, "together with all improvements I may hereafter make." and it was found as a fact by Mr. Justice Bradley that the letters patent in suit were but improvements upon the former one. . It will be noted that an interval of 10 years separated the assignment of the first patent and the issue of the one found to be an improvement thereon,—an interval so extended as to forbid the belief that the invention embodied in the later patent was, at the time of the assignment, already in the mind of the patentee. In this respect the case is an advance upon Littlefield v. Perry. Disposing of the question thus raised, Mr. Justice Bradley says (32 Fed. 700):

"That such assignments of future improvements upon a machine, in connection with the assignment of a patent for such machine, are valid, is settled, I think, by the case of Littlefield v. Perry, 21 Wall. 226. A naked assignment or agreement to assign, in gross, a man's future labors as an author or inventor,— in other words, a mortgage on a man's brain, to bind all its future products,— does not address itself favorably to our consideration. It is something like engagements of an expectant heir, binding the property which he may afterwards inherit, which are always looked upon with disfavor by the law. But where a man purchases a particular machine secured by a patent, and open to an indefinite line of improvements, it is often of great consequence to him that he should have the benefit of any future improvements that may be made· to it. Without that, the whole value of the thing may be taken away from him the next day. A better machine might be made by the inventor, and sold to another party, which would make the machine acquired by the first purchaser entirely useless. These things happen every day. And hence it has become the practice, in many cases, to stipulate for all future improvements that may be

made by the same inventor upon any particular machine which he induces a party to purchase from him, sometimes by way of license to use such improvements, and sometimes by way of purchase and ownership thereof."

It must have been urged in the argument of Aspinwall v. Gill, as it was in the case under consideration, that there was no equitable consideration auxiliary to the naked contract obligation, such as the relation of employer and employé, the receipt of royalties, the use of facilities furnished by the parties asking for the transfer, and the like, to support the claim for the specific performance asked; for Mr. Justice Bradley proceeds:

"Where the inventor is connected in business with the party making such stipulations, or is interested in the profits arising from the business in which the invention is used, the arrangement seems to be altogether unobjectionable. But such a connection or interest does not seem to be necessary to the validity of such bargains. If based upon a valuable consideration, they are sustained as collateral or incidental stipulations connected with the conveyances of a principal subject."

The doctrine of these two cases is followed in McFarland v. Manufacturing Co., 53 N. J. Eq. 649, 33 Atl. 962, in which the court says:

"Where the owner of a patent assigns it to another, together with all future improvements which he may make on such a patent, the equitable title to any improvements thereafter made by the assignor vests in the assignee as soon as the improvement is in esse, capable of being identified."

This rule thus broadly enunciated by Chief Justice Waite in Littlefield v. Perry, 21 Wall. 226, and by Mr. Justice Bradley in Manufacturing Co. v. Gill, 32 Fed. 697, is followed by other cases more or less in point; among them, Hulse v. Machine Co., 13 C. C. A. 180, 65 Fed. 864; Machine Co. v. Morse, 103 Mass. 73; Registering Co. v. Sampson, L. R. 19 Eq. 462. In the latter case the master of rolls, Sir George Jessel, meets the question with the following common-sense observations:

"Now, nothing is better known than this: that when persons have turned their attention to a particular class of inventions they are likely to go on and invent, and likely to continuously improve the nature of their invention, and continuously to discover new modes of attaining the end desired. Persons, therefore, who buy patents of inventors are in the habit of protecting themselves from the utter destruction of the value of the thing purchased by bargaining with the seller that he shall not use any new invention of his for producing that product in which they are about to deal at a cheaper rate, because, if he were allowed to do so, he might, the day after he has sold his patent, produce something which, without being technically an infringement, and without being technically an improvement, would accomplish the desired object in some other way, and utterly destroy the value of that which they had purchased. They, therefore, not unreasonably, and not unusually, make it a part of their bargain that whatever the man discovers of the same kind, in the shape of machinery or apparatus, which will produce the product in which they are about to deal, shall belong to them. They say, 'We cannot buy on any other terms, because otherwise we are exposed to the instantaneous, or almost instantaneous, competition of the inventor with the benefit of his previous experience.' That, as I said before, is not unusual, nor is it an unreasonable bargain."

I need not say that I concur with Mr. Justice Bradley in the general statement that "a naked assignment or agreement to assign,

in gross, a man's future labors as author or inventor,—in other words, a mortgage upon a man's brain,—does not address itself favorably to our consideration." The contravention of public policy involved in such an agreement needs no support in the argument that in such instances the public is deprived of the industrial and literary gains of the person mortgaged. A policy permissive of such enslavement goes further, and offends all sense of the dignity of manhood and of the value of individual liberty. Were the case under consideration an instance of a mortgage, in gross, of one's future labors as an inventor, I would deny, without hesitation, the remedy here invoked.

But the case under consideration presents no agreement to assign in gross Park's future labors as an inventor. In return for a large sum of money, he sold to the complainant, not only the inventions then completed and in process of completion, but all the future improvements thereon calculated to make the necessarily imperfect devices more nearly perfect. It is often of great consequence that one who secures a mechanism open to an indefinite line of improvement should have the benefit of any future improvements that may be made. "Without that," says Mr. Justice Bradley, "the whole value of the thing may be taken away from him the next day, and a better machine might be made by the inventor, and sold to another party, which would make the machine acquired by the first purchaser entirely useless. These things happen every day." "An assignment of an imperfect invention," says Chief Justice Waite, "with all the improvements upon it that the inventor may make, is equivalent in equity to an assignment of the perfected results." The obligation resting upon Park by virtue of his contract relates only to the perfection of what he has already sold and has been already paid for. A decree for the complainant will require him to do only what he has contracted to do touching this valve mechanism. In every other field of invention the full opportunities of his genius are still open to him.

It is true that the incentive to perfect the inventions may, under the restrictions of this contract, be lost or lessened, and that the public may thus be deprived of the full fertility of his brain in that particular direction. But considerations of public policy must not be determined by any narrow view. What may seem, as the result of any particular case, to be a loss to the public, may, upon a broader consideration, reasonably be laid aside in the greater losses that would follow a contrary policy.

No one will deny that inventive genius has given to mankind most of its present material civilization. Nearly every convenience of modern life is the outgrowth, more or less directly, of some fertile inventive intellect. The magnificent flower of civilization, everywhere surrounding us, has opened from germs that were fructified from the brains of our inventors. The world owes much of its possessions to their activity. No persons more clearly recognized this, or more clearly foresaw the justice and the policy of liberally protecting the fruits of the inventive mind, than the framers of our constitu-

tion, and, successively, the framers of the laws relating to patents ever since. These enactments have given to this character of intangible property its best title and its most enduring right to exist. They have dignified and secured it equally with all other rights of property. They have made it possible that a full mind might make a full purse.

But property thus created by the mind, and secured by law, even more than tangible property, depends for its value upon finding a ready market. Inventors are, proverbially, indifferent financiers and builders up of enterprises. The faculty that can penetrate through the mazes of a mechanical or chemical problem to a practical result seldom resides in the same brain with the faculty that can apply such result to the environment of ordinary life. The inventor and the successful manager are rarely the same man. The first usually brings his property to the market, where the latter may be found.

But the property thus brought is unlike that usually offered. It is wholly intangible; more than that, in the absence of artificial protection, it immediately becomes the common possession of mankind. The right of monopoly alone protects it; the right of monopoly is the only thing of value the inventor can transfer.

But men will not pay much for a right that may to-morrow be the common possession of their competitors; nor will they, for the same reason, pay much for an invention that may to-morrow be outclassed by another from the same brain. Purchasers of rights under patents realize more keenly than others that one invention is, in all probability, only the father to a train of others, and that the offspring will soon displace its predecessor. A full monopoly, therefore, is not obtained unless the outgrowth, as well as the original root, of the conception is secured. On this basis alone will capital deal upon any liberal scale for the inventor's property. It is along these lines of commerce, inevitably regulating true value, that the inventor's real chances for compensation must be found. The public policy that recognizes this, and does not attempt, out of momentary or special considerations, to fly in its face, is the only policy truly advantageous to the inventive class.

The clause introduced in the assignment under consideration is only in furtherance of such security against the possibilities of the future. The failure of the court, as between the parties now before it, might lend momentarily a larger incentive to Park's inventiveness; but it would, at the same time, if it became the settled doctrine of the courts, destroy, to an extent beyond easy appreciation, the exchangeable value of every patent hereafter offered to the market. It would, in my judgment, be one of those mistaken policies which, seeking to alleviate a particular hardship, visits, in the end, an infinitely wider and graver injury than the one avoided. The natural course of commerce, in this as in other fields, will avenge itself upon every artificial policy, however well intended, that is calculated to impair or break down confidence and value. I cannot help but think

that, in its broader conception, public policy requires that Park should be held to the spirit of his contract.

The effect of these views, were the patent still in the hands of Park, would be to require an assignment from him to the complainant. I am of the opinion that this is not changed by reason of the fact that third parties now appear as owners of the patents under assignment from Park. Under the law, all subsequent inventions of Park, coming within the field of improvements upon the inventions already transferred, became, by virtue of the stipulation of the assignment, the property of the complainant. I am forced to the conviction by the testimony in this case that Park's assignees had sufficient notice of the relation of Park to the complainant, involving the stipulation in the assignment under consideration, to put them on inquiry, and cannot be regarded, therefore, as innocent purchasers without notice; but, were not this the case, I would hold, upon the authority of Littlefield v. Perry, supra, that the registration of the assignments in the patent office at Washington was constructive notice to the world. Of course, in view of either of these conclusions, Park's assignees stand in his shoes.

There is nothing in the correspondence or conduct between the complainant and the defendant Park which, in my judgment, ought to estop the complainant from its right of specific performance; but I conceive that the court may condition this form of remedy upon the complainant's doing full justice, under all circumstances, to the defendant. Such full justice, I think, requires that the complainant should reimburse Park all his outlays in the matter of perfecting these later inventions and procuring letters patent thereon; also that Park should be paid a reasonable per diem, measured by what his service would have commanded in other fields for which he was fitted, such as expert witness, mechanical witness, etc., for the full time actually devoted by him to what might be called the mechanical habiliment of the idea involved in the inventions, as well as in the preparation and procuring of letters patent. A decree ordering specific performance, but thus conditioned, may be entered in favor of the complainant against all the defendants.