WEGE v. SAFE-CABINET CO.

(Circuit Court of Appeals, Sixth Circuit. April 3, 1918.)

No. 2982.

1. CONTRACTS ⬦152—CONSTRUCTION—LANGUAGE.
    The language of a contract itself must control, unless the parties themselves have placed a practical construction upon it to the contrary.

2. MASTER AND SERVANT ⬦62—INVENTIONS OF SERVANT—AGREEMENTS TO ASSIGN—CONSTRUCTION OF PATENT.
    A patent for a sheet metal safe or cabinet, issued to defendant, *held* one for an improvement in the safe cabinet art, and within the terms of a contract requiring defendant to treat as the property of his employer all his improvements in a safe-cabinet and his inventions embodying any principles of safe-cabinet construction.

3. SPECIFIC PERFORMANCE ⬦71—CONTRACTS—PATENTS.
    When couched in unambiguous terms, a contract obligating an inventor to treat all inventions and patents applicable to a particular art as the property of his employer is specifically enforceable.

⬦For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

**4. CONTRACTS** ⟨⟩108(2)—VALIDITY—PUBLIC POLICY.

Where defendant agreed that any patents for improvements or inventions which he might secure in a particular art should belong to his employer, such contract, though applying to a patent for an improvement in the art secured after defendant terminated his employment, is not invalid, as opposed to public policy, for, if the contract was limited to patents secured during the term of service, defendant might well evade its provisions.

**5. MASTER AND SERVANT** ⟨⟩62—INVENTIONS OF SERVANT—ASSIGNMENT.

Where the contract between defendant and his employer, requiring him to act as superintendent of the employer's manufacturing business, provided that any patents for improvement and inventions in the article manufactured should become the property of the employer, defendant is impliedly bound to assign such patents.

**6. APPEAL AND ERROR** ⟨⟩1079—BRIEFS—WAIVER OF ERROR.

Where nothing more than the bare assignment of error is set forth in the brief, the error must be deemed waived.

Appeal from the District Court of the United States for the Southern Division of the Western District of Michigan; Clarence W. Sessions, Judge.

Bill by the Safe-Cabinet Company against Peter M. Wege. From a decree for complainant, defendant appeals. Affirmed.

Fred Chappell and Otis A. Earl, both of Kalamazoo, Mich., for appellant.

F. D. Campau, of Grand Rapids, Mich., T. J. Summers, of Marietta, Ohio, and James L. Steuart, of New York City, for appellee.

Before WARRINGTON and KNAPPEN, Circuit Judges, and McCALL, District Judge.

WARRINGTON, Circuit Judge. This is an appeal from a decree requiring Wege to assign certain letters patent and all his rights thereunder, including all claims for past infringements of the patent, to the Safe-Cabinet Company. Wege and the company entered into a written contract on August 7, 1909, whereby Wege was engaged as superintendent of the company upon a salary schedule fixing his compensation according to the amount of business which the company might transact in a series of years, commencing with a minimum salary of $3,000, and running to a maximum of $5,000. On September 8th following they entered into another written contract, which required the company to issue to Wege 50 shares, of $100 each, of its fully paid common stock, and Wege to render services to the company in substance embracing (a) "all present and future mechanical improvements of the safe-cabinet," and (b) "all developments and inventions embodying any or all the principles involved in the safe-cabinet construction, due in part or altogether to" Wege's "talent and labor," and, when made the subjects of United States patents, such patents "and what they may lawfully include" were to be the property of the company. A second clause of this contract reserves to Wege "full property rights in all patents secured by him for inventions in steel or other construction, except as above stated, which are due to his talent and labor, except as may be modified by mutual agreement hereafter,"

and as to patents so secured by Wege and not covered by the first clause the parties were to agree upon their purchase or use by the company; Wege agreeing to offer such excepted patents to the company "before undertaking to market any of them elsewhere."

March 25, 1910, the parties made another contract in writing supplemental to and without intending to modify the previous contracts of August 7 and September 8, 1909. By the first clause the company agreed to retain Wege as its superintendent of construction for five years from February 1, 1910, under his "guaranteed salary contract" of August 7, 1909, with the understanding, however, that he should "give his undivided time and service" to the company and to its satisfaction. By the second clause of the contract, and as an additional compensation for his service and for his "inventions and patents on the safe-cabinet construction proper (all of which by previous existing contracts are and shall be the absolute property of said company)," the company agreed to pay Wege 2 per cent., payable quarterly, of all its business in safe-cabinet construction during the life of "any and all safe-cabinet construction patents," or so long as he should remain or be willing to remain in the company's employ, "irrespective of the time period of five years named herein."

November 3, 1911, the parties made another supplemental contract in writing, by which the company purchased the 50 shares of capital stock which it had previously issued to Wege as stated, paying therefor $5,000 in cash, and the second clause of the contract of March 25, 1910, was canceled, including the obligation of the company to pay Wege 2 per cent. quarterly on its safe-cabinet business, though it is to be noted that before this second clause was canceled Wege had been paid under the 2 per cent. provision the sum of $3,595.39. Thus, Wege was at last guaranteed his position as superintendent for at least five years from February 1, 1910, under a salary graduated between $3,000 and $5,000 according to the amount of the company's business in its safe-cabinet construction, and was also paid a total of more than $8,500 on the faith of his promise to treat as the company's property all of his improvements of the safe-cabinet and all of his developments and inventions embodying any of the principles of the safe-cabinet construction.

He carried out these contracts for a time, both as superintendent and inventor. Of his own accord he left the company's service as its superintendent February 1, 1912, just two years after the guaranty of his position began to run; but before leaving he conceived at least four inventions in the safe-cabinet art, and applied for patents upon all of them. Patents upon three were issued to him as assignor to the company prior to severing his employment as superintendent, and upon the other after that event. These patents may be identified thus: No. 993,483, May 30, 1911, relating to a door which the drawings show is a safe-cabinet door; No. 993,627, May 30, 1911, providing for an improved "cabinet, safe, or other walled structure," and the drawings show a safe-cabinet; No. 999,929, August 8, 1911, which is declared in the specification to be "particularly adapted for fireproof cabinets and safes"; No. 1,038,038, September 10, 1912,

relating to a "combined shelf and partition, more especially for sheet metal cabinets."

[1, 2] Wege refused, however, to accede to a demand of the company to assign to it the patent in suit, and this resulted in the present action. Whether Wege is under contractual obligation to assign this patent is the issue. Wege applied for the patent August 16, 1912, and it was issued February 25, 1913, No. 1,054,325, entitled "Sheet Metal Safe or Cabinet." In view of Wege's covenants with the company, before pointed out, it is important briefly to consider the meaning and scope of safe-cabinet construction, in connection with the subject of the patent in suit. This is not to imply, however, that the comparison so suggested need be carried to the extent usually required in a patent suit. We are not called upon, for instance, to pass upon any question of validity or infringement of the patent in issue. We have only to determine whether the subject-matter of the patent falls fairly within the category of "safe-cabinet" or "safe-cabinet construction," as those terms were used in defining the contractual obligations of the parties.

The business of producing what is known as the safe-cabinet appears to have originated in 1905 with a copartnership, which was carried on under the name of the present appellee and was subsequently converted into a corporation. Willis V. Dick, a member of this copartnership and now president of appellee, testified that he manufactured "a fire-resisting product known as the safe-cabinet produced by the Safe-Cabinet Company," and, further, that he "was the inventor of the original safe-cabinet." Although it is insisted that some of the elements of his safe-cabinet are old, we do not find any contradiction of this testimony. A patent was issued to Willis V. Dick, January 9, 1906, No. 809,497, entitled "Fire-Resisting Cabinet." He states in his specification:

"The object of this invention is to provide a fire-resisting cabinet, chiefly of sheet metal, which shall be of simple and economical construction, and in which papers, documents, and other perishable things may be stored with reasonable assurance against loss or injury by fire and water, especially in incipient conflagrations."

The structure is described in detail in his specification and is illustrated by accompanying drawings. Its appearance is similar to that of the old type of safes. Its interior is equipped with shelving designed for the filing of papers, documents, and the like; the end (or side) and back walls, as also the two doors in front, are composed of exterior and interior vertical plates of sheet metal, which are so spaced and fastened one with another as to form air chambers between them; the base and top are composed of heavy sheet metal suitably adjusted and, through the use of bolts and nuts or rivets, fastened to the walls. The interiors of the sheet metal walls and of the doors of the cabinet are provided with a sheeting of asbestos to protect them against heat. Metal tie pieces and braces are used for connecting the vertical terminals of the end and back walls and bracing them; and the specification suggests that the paneling of the metal will add to the rigidity of the structure and also enhance its appear-

ance. The doors are provided with lips all around, so as to lap on the front of the cabinet and on each other, and are provided with combination lock, etc. The prominent results sought to be obtained by this construction, according to the specification and claims, were its double walls, lightness, rigidity, fire-resisting qualities, and economy.

The claims do not specify doors, and it is to be noted that some of the models introduced have doors and some have not. A number of the claims relate to the interior shelving, which is not important in the present suit. Claims 1, 2, and 9 may be treated as typical, so far as present pertinency is concerned, of the patented device; they are copied in the margin.[1]

A specific description of a patented structure confessedly belonging to the safe-cabinet art is to be found in Safe-Cabinet Co. v. Globe-Wernicke Co., 242 Fed. 497, 155 C. C. A. 273 (C. C. A. 2). The patent there in suit, No. 999,929, was one of those issued to Wege as assignor to the present appellee, as above pointed out.[2] The patent was held anticipated and invalid; and it is to be observed that one of the anticipating patents there cited and commented on was the Dick patent, above partially described for purposes of the present case. In alluding to the Dick patent, Judge Rogers said (242 Fed. at page 505, 155 C. C. A. at page 281):

"Also prior in time to Wege is the Dick patent, No. 809,497, applied for on February 7, 1905, and issued on January 9, 1906. That was granted for 'new and useful improvements in fire-resisting cabinets.' The specification discloses a double walled sheet metal cabinet of the general shape and outline of that in which it (the complainant) now claims to employ the invention of the patent in suit. It describes 'paneling of the metal' as employed to give rigidity to the structure, and uses interlocking flanges to join the sheet metal parts together, but reinforces these joints by the use of screws and rivets. It is indistinguishable in function and in general appearance from the patent in suit."

---

[1] "1. In a fire-resisting cabinet, the combination, with a base, of end and back walls of sheet metal, said end wall having an inwardly standing vertical terminal portion $1c$ and said back wall having an outwardly standing vertical terminal, a tie piece for connecting the said terminals of said end and back walls consisting of a doubly and oppositely grooved piece in which said terminals project, and means for securing said piece to said terminals."

"2. In a fire-resisting cabinet, the combination, with a base, of end and back walls of sheet metal, a tie piece and brace for connecting the vertical terminals of said end and back walls and bracing the same, consisting of strip of metal bent to form a double groove into which the said terminals project and a wing to constitute the brace."

"9. In a fire-resisting cabinet, the combination with a suitable base, of the vertical casing thereof comprising an outer wall of sheet metal made in three pieces, to wit, end portions $1$ having back portions $1a$ integral therewith extending partially across the back, and portions $1b$ integral with the end portions extending partially across the front and a portion $2$ connecting the edges of the portions $1a$ at the back, and an inner wall also of sheet metal extending parallel to the outer wall and joined thereto at or near the edge of the wall $1b$, substantially as described."

[2] The complete double wall feature of the structure described in this patent is to be particularly noticed, since it shows that Wege, as well as the company, regarded this feature as a distinct element of safe-cabinet construction more than a year and a half before the patent in suit was issued.

Examination of that decision, in connection with the fact that Wege considered himself bound to assign the patent there in suit to the present appellee, cannot fail to show that when designing that device Wege regarded the principles of safe-cabinet construction as at once broad in scope and calling for development. That he believed the subject was meritorious is shown by his testimony in the present case:

"It is a fireproof article, and it is the lightest fireproof article in steel furniture I have ever seen."

And although the patent here in issue contains all the essential elements, or their equivalents, of the safe-cabinet construction, yet Wege in effect relies on a single feature and the claimed relation of that feature to the other elements of the patent, to show that the patent does not belong to the safe-cabinet art. We have seen that Wege applied for the patent August 16, 1912, a few months after he quit the company's service as superintendent. He stated in his specification that he had "invented certain new and useful improvements in sheet metal safes or cabinets"; also:

"This invention relates particularly to improvements in sheet metal safes or cabinets, with sheet metal walls. While my improvements are particularly available for safes and the like, and I have illustrated the same embodied in a safe structure, the invention may be made use of in double walled structures in various relations."

The main objects of the invention, he in substance adds, are "to provide an improved sheet metal walled structure which is" (1) "light and simple," "economical to produce," "easily and quickly assembled"; (2) "very rigid"; (3) "in which the passage of heat through the wall joints and door joints is quite effectively prevented." It is unnecessary to point out the practical identity in name and objects of this structure with the name and objects of the safe-cabinet; this is manifest. Further, the drawings throughout illustrate a safe-cabinet and nothing else; and it has been placed in direct competition with appellee's safe-cabinet.

What Wege does here is to place two rectangular metal frames within the walls to engage and reinforce them. The rear frame is held in place between the outer and inner rear walls, such inner wall engaging the entire inwardly turned flange of the frame; the front frame is contained within inwardly turned angle flanges of the front terminals of the outer top, bottom and side walls; the front frame and the edges of the rear wall engage respectively the front terminals and the rear terminals of the inner top, bottom, and side walls; specific description of these parts, or of the mode of assembling them, is not of present importance; it is sufficient to say that the structure is a double wall safe-cabinet. The most that can be said of the frames is that they serve to enhance the rigidity of the structure. When once placed in position, they differ in form, though not in function, from the frame of the patent, No. 999,929, turned over to appellee by Wege in pursuance of his contract, as already stated (see in this connection Safe-Cabinet Co. v. Globe-Wernicke Co., supra, 242 Fed. at page 501, 155 C. C. A. 273); but, save in matter of de-

gree, it is hard to perceive any material difference in either function or operation between the frames of the patent in suit and the metal tie pieces and braces above pointed out in the Dick patent (see claims 1 and 2, note 1, supra). True, as before indicated, counsel urge in Wege's behalf that the frames of the patent in suit are made distinct elements of each of the combinations recited in all but one of the claims, and that these frames and their connections with the other parts constitute the subject-matter of the patent; and the decision of this court in the Scaife Case, 209 Fed.. at pages 214, 215, 126 C. C. A. 304, is cited in support of a contention in substance and effect that the claims of the patent in suit must be construed as entitling Wege to combine and use with his frames the old parts of the safe-cabinet; in other words, that by introducing into its construction a new method of bracing and strengthening the safe-cabinet he could rightfully monopolize the whole. This ignores alike the contract on which the instant case is founded and the fact that no contractual question was involved in the Scaife Case. The present contract is explicit, and, unless the parties themselves have placed a practical construction upon it which is inconsistent with the recovery here sought, the language of the instrument itself must control the case.

It is insisted for Wege that the patent in suit is but a development of what is called the Unette patent, No. 993,484, which was issued to Wege May 30, 1911; and it appears that on December 5, 1911, the company gave to Wege a certificate that the contract between the parties did not involve the Unette patent, and that he was "free to deal with this particular patent according to his own will and opportunity." It is to be observed that this certificate was delivered about one month after the date of the last contract the parties entered into. We are unable to appreciate the claimed relevancy of this patent to the present controversy. In the first place, the Unette patent does not call for a double wall structure within the meaning of safe-cabinet construction; it only calls for a supplemental interior wall on two sides to secure the bracing pieces in position. The reason for not following the Unette plan is to be found in Wege's specification for the patent now in suit:

"A double walled structure is secured which is of very great advantage in safes and structures of like character."

Assuming, as counsel claim, that double walls were old, yet this could not help Wege. Since double walls were an essential feature of the safe-cabinet at the time Wege entered into the contract in issue, he could not thereafter appropriate this element to himself as part of an improved safe-cabinet upon any theory either that the element was old or that the element was contained in his Unette patent. In the next place, it is true that for the purpose of strengthening the Unette device Wege placed metal angle braces, calling them in his claims "angular bracing pieces," at the corners of the structure, though the arms of these braces were made to extend only short distances from the corners. These angle braces may be helpful in a partially double wall structure, like the Unette, but they have never been used in a double wall structure, like the safe-cabinet. It was there-

fore not unnatural for the company in December, 1911, to yield as it did to Wege's solicitation to give him the certificate in question. It is an entirely different matter, however, for Wege now to claim that he thus secured a right, not only to convert the Unette into a double wall safe-cabinet, but also to make a distinct improvement upon the bracing features of the safe-cabinet, and then treat the invention as his own property. The language of the certificate does not warrant such results as these. Wege was left "free to deal with this particular [Unette] patent according to his own will and opportunity." It was that patent, not the patent in suit, to which that language was applied. Saying that Wege might "deal" with the Unette was far from saying that he might convert the device into a structure that would destroy both the contract and the safe-cabinet.

Another Wege patent, No. 1,017,354, issued February 13, 1912, is offered to show that the company recognized the right of Wege to use metal corner braces similar to those of the Unette patent, and also in a structure of extraordinary width to employ an intermediate metal interlocking piece to connect with an arm of each of two opposed corner braces, leaving the other arms of such corner pieces of their normal length. This interlocking connection is effected by making a recess and a tongue near the end of each of such opposed corner bracing arms and near each end of the intermediate member, so that such recesses and tongues will register one with another. Here again we find, as in the Unette patent, an inner supplemental wall on two sides of the structure to hold the interlocked pieces in place. It does not appear that this structure has been specially adapted to safe-cabinet construction, nor that it has ever been used in a construction of that kind. The patent was offered to the company, however, if it would accept and pay for it under the second clause of the contract. Our attention is called to the circumstance that the president of appellee appears to have been one of the witnesses to the letters patent; but this, like the refusal to accept the patent, would seem to signify that the interlocking device was not regarded as useful. It is vain for counsel to say that the company's attitude toward this patent was not consistent with its demand for an assignment of the patent in suit. That patent is not like the patent in suit; but, if it were assumed that a mistake was made in not demanding its assignment, this could not affect the validity of the demand made for the patent in suit.

[3] In view of all the facts we are convinced that the patent in suit is a development of the safe-cabinet, and not of either the Unette patent or the patent last considered (1,017,354), and hence that the case must be controlled by the first clause of Wege's contract of September 8, 1909. This contract is distinct from the one employing Wege as superintendent, and according to its terms it is still subsisting. As we have seen, the first clause of this contract obligated Wege, in consideration of $5,000 in paid-up stock of the company, to turn over to it all of his "present and future mechanical improvements of the safe-cabinet" and all of his "developments and inventions embodying any or all the principles involved in the safe-cabinet construction." At the dates of these two contracts the company was the owner of the

Dick patent, and under this patent was engaged in the business of producing the safe-cabinet; through the contracts Wege became pecuniarily interested in the company; both his salary as superintendent and the value of his stock were to be directly affected by the success of the business. It hardly can be doubted that in such circumstances it was competent for the parties to bind themselves according to the covenants of the first clause of the contract of September 8, 1909. It is true that contracts of this character are more frequently entered into with reference to assignments of particular patents and protection of the assignees against impairment, if not destruction, of the value of the patents through improvements subsequently made by the assignors. It is a well-settled rule that contracts of this latter class, when couched in unambiguous terms, are binding and specifically enforceable. Littlefield v. Perry, 88 U. S. (21 Wall.) 205, 222, 22 L. Ed. 577; Aspinwall Mfg. Co. v. Gill, 32 Fed. 697, 700 (C. C.), by Mr. Justice Bradley; · Printing & Numerical Registering Co. v. Sampson, L. R. 19 Eq. 462, 464, by Sir George Jessel; Lion Tractor Co. v. Bull Tractor Co., 231 Fed. 156, 161, 145 C. C. A. 344 (C. C. A. 8); Westinghouse Air Brake Co. v. Chicago Brake & Mfg. Co., 85 Fed. 786, 791 et seq. (C. C.). The recent case of American Cone &ꞌ Wafer Co. v. Consolidated Wafer Co., 247 Fed. 335 (C. C. A. 2), is distinguishable from this class of decisions, because the contract there involved was regarded by the court as vague and uncertain.

[4] The principles of that class of decisions are essentially applicable to contracts like the present one. Here was a special business founded on a particular patented device, the safe-cabinet; the covenants in question were limited to the "present and future" improvement and development of the safe-cabinet, and save in this respect did not purport to interfere with Wege's exercise of his inventive faculties. The subject of the contract was known to Wege when he entered into it; as long as his pecuniary interest continued Wege performed his covenants; in this period he was told all the business secrets and designs of the company. Can it be that he could absolve himself from the obligation of the contract by voluntarily ʾselling to the company his stock and then withdrawing from its service as superintendent? Apart from the analogy of Wege's covenants to those considered in the class of decisions already cited, we think an inventor may, under such circumstances as exist here, aside from his right to bind himself as an incident to his assignment of a patent, lawfully obligate himself to improve and develop a particular device belonging to another person and to assign or otherwise turn over to such person any inventions he may produce in that behalf. This in principle is recognized with respect to · contracts of employment where appropriate provision is made in the contract; it is true that the employé's production may be limited to discoveries made ʾduring his employment, but this cannot militate against the right to provide for continuing the obligation, regardless of the period of employment; if such safeguard were not available, the inventor might through knowledge obtained in his employment evade the contract later and render it valueless. Hulse v. Bonsack Mach. Co., 65 Fed. 864, 866, 13 C. C. A. 180, et seq. (C. C. A. 4); Thompson v. Automatic Fire Protection Co., 155 Fed. 548, 550 (C. C.); Id., 197

Fed. 750, 752 (D. C.), affirmed 211 Fed. 120, 121, 128 C. C. A. 22 (C. C. A. 2). See, also, Reece Folding Mach. Co. v. Fenwick, 140 Fed. 287, 288, 72 C. C. A. 39, 2 L. R. A. (N. S.) 1094 (C. C. A. 1), Judge Putnam announcing the opinion, though specific performance of the contract was denied for a reason of no present importance. It follows that the present contract is not open to counsel's criticism that this interpretation of Wege's covenants is opposed to sound policy, in that it would prevent him from developing the Unette patent and amount to "a mortgage on a man's brain." The difficulty with the criticism is that under the guise of the Unette patent Wege has produced a safe-cabinet, and so has invaded even the limited field he obligated himself to cultivate for the benefit of appellee.

[5] Counsel call attention to the fact that the contract does not in terms require Wege to transfer to appellee any patent resulting from future inventions. In view of the rule laid down in Littlefield v. Perry, supra, 88 U. S. (21 Wall.) at page 226, 22 L. Ed. 577, we think Judge Sessions correctly disposed of this objection:

"While the contract does not contain a specific provision for the assignment of patents which under its terms are 'the property of the safe-cabinet company,' such requirement is clearly and necessarily implied. Moreover, by the assignment of four previous patents, defendant has expressly recognized his obligation to assign."

[6] After the opinion below was announced, Wege obtained leave to file an account of alleged cost of developing the structure of the patent in suit and securing letters patent, $3,693. This was disallowed, except as to this last item of cost $135.50. Error is assigned to such disallowance, but nothing more than the assignment is set out in the brief, and it must be regarded as waived.

The decree is affirmed.