## NORTHERN PACIFIC RAILROAD COMPANY v. MUSSER-SAUNTRY LAND, LOGGING AND MANUFACTURING COMPANY.

### APPEAL FROM THE CIRCUIT COURT OF APPEALS FOR THE SEVENTH CIRCUIT.

No. 121.. Argued November 30, December 1, 1897. — Decided December 20, 1897.

The withdrawal from sale by the Land Department in March, 1866, of lands within the indemnity limits of the grants of June 3, 1856, and May 5, 1864, to the State of Wisconsin to aid in the construction of a railroad, exempted such lands from the operation of the grant to the Northern Pacific Railroad Company by the act of July 2, 1864; though it may be

that a different rule would obtain if the grant to the State had been of a later date than that to the Northern Pacific Company.

As to place lands, it is settled that, in case of conflict, the title depends on the dates of the grants, and not on the times of the filing of the maps of definite location.

It is not intended hereby to question the rule that the title to indemnity lands dates from selection, and not from the grant: but all here decided is, that when a withdrawal of lands within indemnity limits is made in aid of an earlier land grant, and made prior to the filing of the map of definite location by a company having a later grant — the latter having such words of exception and limitation as are found in the grant to the plaintiff — it operates to except the withdrawn lands from the scope of such later grant.

THE facts in this case are as follows: On June 3, 1856, c. 43, 11 Stat. 20, Congress made a grant to the State of Wisconsin to aid in the construction of a railroad of every alternate section of land designated by odd numbers, for six sections in width, on each side of the line, with the right to select indemnity within fifteen-mile limits. The line of this road was definitely fixed September 20, 1858. This grant was enlarged by the act of May 5, 1864, c. 80, 13 Stat. 66, to one of ten alternate sections on each side per mile with indemnity limits extended to twenty miles from the line of the road. The Chicago, St. Paul, Minneapolis and Omaha Railway Company, one of the defendants herein, became the beneficiary of this grant. The road was afterwards constructed, and the lands in controversy are more than fifteen but less than twenty miles from the line of definite location and construction. In March, 1866, the lands within the indemnity limits named in the act of 1864 were by the Secretary of the Interior withdrawn from sale and notice thereof given to the local land officers. This withdrawal remained unrescinded and unaltered until 1889. In 1883 the defendant railway company selected the lands in controversy in lieu of lands lost in its place limits. These selections were approved by the local land officers and transmitted to the commissioner of the general land office for his approval. In the same year the State of Wisconsin issued patents for the lands to that company, which thereafter sold and conveyed them to the grantor of its co-defendant, the land, logging and manufacturing company. On a readjust-

ment of the land grant the railway company's title failed, and thereafter the grantee of the railway company purchased them, pursuant to the act of March 3, 1887, c. 376, 24 Stat. 556.

On the other hand, the Northern Pacific Railroad Company, plaintiff and appellant, on July 2, 1864, c. 217, 13 Stat. 365, 367, received a grant from Congress. The third section of the act making this grant contains this description of the lands granted :

"Every alternate section of public land . . . to the amount of twenty alternate sections per mile, on each side of said railroad line, as said company may adopt, through the Territories of the United States, and ten alternate sections of land per mile, on each side of said railroad whenever it passes through any State, and whenever on the line thereof, the United States have full title, not reserved, sold, granted or otherwise appropriated, and free from preëmption, or other claims or rights, at the time the line of said road is definitely fixed, and a plat thereof filed in the office of the commissioner of the general land office ; and whenever, prior to said time, any of said sections or parts of sections shall have been granted, sold, reserved, occupied by homestead settlers or pre-empted, or otherwise disposed of, other lands shall be selected by said company in lieu thereof."

On July 30, 1870, plaintiff fixed the general route of its road and filed plats thereof with the Secretary of the Interior. On August 13, 1870, a withdrawal of the lands within twenty miles of this route was ordered in aid of the grant. On July 6, 1882, plaintiff definitely fixed that portion of its line oppo-site these lands. They are within the limits of the above-mentioned withdrawal, and also within the place limits of plaintiff's grant, as those limits were adjusted and fixed according to the map of definite location. Relying upon the title acquired by this grant, and the proceedings had thereunder, as above described, the plaintiff filed its bill on May 3, 1893, in the Circuit Court of the United States for the Western District of Wisconsin, to restrain the issue of patents to the manufacturing company, and to quiet its own title. A demurrer to this bill was, in May, 1894, sustained, and a decree

entered dismissing the bill.   On appeal to the Court of Appeals for the Seventh Circuit this decree was affirmed, 34 U. S. App. 66, and thereupon the plaintiff brought the case to this court for review.

*Mr. C. W. Bunn* for appellants.

*Mr. Thomas Wilson* for appellees.

Mr. Justice Brewer, after stating the case, delivered the opinion of the court.

But a single question is presented in this case, and that is whether the withdrawal from sale by the Land Department in March, 1866, of lands within the indemnity limits of the grant of 1856 and 1864 exempted such lands from the operation of the grant to the plaintiff.   It will be perceived that the grant in aid of the defendant railway company was prior in date to that to the plaintiff, and that before the time of the filing of plaintiff's maps of general route and definite location the lands were withdrawn for the benefit of the defendant.   The grant to the plaintiff was only of lands to which the United States had "full title, not reserved, sold, granted or otherwise appropriated, and free from preëmption, or other claims or rights, at the time the line of said road is definitely fixed."

The withdrawal by the Secretary in aid of the grant to the State of Wisconsin was valid, and operated to withdraw the odd-numbered sections within its limits from disposal by the land officers of the Government under the general land laws.   The act of the Secretary was in effect a reservation. *Wolcott* v. *Des Moines Co.*, 5 Wall. 681; *Wolsey* v. *Chapman*, 101 U. S. 755, and cases cited in the opinion; *Hamblin* v. *Western Land Company*, 147 U. S. 531, and cases cited in the opinion.   It has also been held that such a withdrawal is effective against claims arising under subsequent railroad land grants. *St. Paul & Pacific Railroad* v. *Northern Pacific Railroad*, 139 U. S. 1, 17, 18; *Wisconsin Central Railroad* v. *Forsythe*, 159 U. S. 46, 54; *Spencer* v. *McDougal*, 159 U. S. 62.

While it is true that the intent of Congress in respect to a land grant is to be determined by a consideration of all the provisions of the statute, and that the word " reserved " may not always be held to include lands withdrawn for the purpose of supplying possible deficiencies in some prior land grant, yet, as that is the ordinary scope of the word, if any narrower or different meaning is to be attributed to it in this grant the reasons therefor must be clear. The use of a word which has generally received a certain construction raises a presumption that Congress used it in this grant with that meaning, and it devolves on the one claiming any other construction to show sufficient reasons for ascribing to Congress an intent to use it in such sense. It is said that the phraseology of the various Congressional grants is different, and therefore each one must be considered by itself. This, in a general way, may be admitted, but at the same time the frequent use of a certain word in a particular sense is, to say the least, very persuasive that it was used in a like sense in this grant.

But beyond the significance of the word " reserved," alone, there are other words in the act which, taken in connection with it, make it clear that these lands do not fall within the grant. " Otherwise appropriated " is one term of description, and evidently when the withdrawal was made in 1866 it was an appropriation of these lands so far as might be necessary for satisfying that particular grant. It is true it was not a final appropriation or an absolute passage of title to the State or the railway company, for that was contingent upon things thereafter to happen ; first, the construction of the road, and, second, the necessity of resorting to those lands for supplying deficiencies in the lands in place ; still it was an appropriation for the purpose of supplying any such deficiencies. Again, in the description, are the words " free from preëmption or other claims or rights." Certainly, after this withdrawal, the Wisconsin Company had the right, if its necessities required by reason of a failure of lands in place, to come into the indemnity limits and select these lands. Can it be said that they were free from such right when the very purpose of the withdrawal was to make possible the exercise of the

right? But the language is not simply "free from rights," but "free from claims," and surely the defendant railway company had an existing claim. No one can read this entire description without being impressed with the fact that Congress meant that only such lands should pass to the Northern Pacific as were public lands in the fullest sense of the term, and free from all reservations and appropriations and all rights or claims in behalf of any individual or corporation at the time of the definite location of its road. *Northern Pacific Railroad* v. *Sanders*, 166 U. S. 620. And such is the general rule in respect to railroad land grants.

*Leavenworth, Lawrence &c. Railroad* v. *United States*, 92 U. S. 733, furnishes an apt illustration. In that case the granting act contained this provision : "That any and all lands heretofore reserved to the United States, by any act of Congress, or in any other manner by competent authority, for the purpose of aiding in any object of internal improvement, or for any other purpose whatsoever, be, and the same are hereby, reserved to the United States from the operation of this act." And it was contended that an Indian reservation was not excepted from the grant because the lands were not reserved to the United States. Upon this the court said (pp. 741, 747) : "Congress cannot be supposed to have thereby intended to include land previously appropriated to another purpose, unless there be an express declaration to that effect. A special exception of it was not necessary ; because the policy which dictated them confined them to land which Congress could rightfully bestow, without disturbing existing relations and producing vexatious conflicts. . . . Every tract set apart for special uses is reserved to the government, to enable it to enforce them. There is no difference, in this respect, whether it be appropriated for Indian or for other purposes." See also *Newhall* v. *Sanger*, 92 U. S. 761, in which it was provided that the grant "shall not defeat or impair any preemption, homestead, swamp land or other lawful claim, nor include any government reservation or mineral lands, or the improvements of any *bona fide* settler ; " and it was held that the lands within the boundary of an alleged Mexican or Span-

ish grant which was *sub judice* at the time the Secretary of
the Interior ordered a withdrawal of lands were, not within
the grant to the company. In *United States* v. *Southern
Pacific Railroad*, 146 U. S. 570, 606, it was said : " Indeed,
the intent of Congress in all railroad land grants, as has been
understood and declared by this court again and again, is that
such grant shall operate at a fixed time; and shall take only
such lands as at that time are public lands."

There is no force in the contention that this construction
might operate to defeat the entire grant to the plaintiff. At
the time of the passage of the act of 1864 only in the vicinity
of the proposed eastern and western termini were there any
settlements. The great bulk of the territory through which
the road was to pass was almost entirely unoccupied. Con-
gress, fixing the time for commencing and for finishing the
work within two and twelve years, respectively, (Sec. 8,) con-
templated promptness in the construction of the road, intending
thereby to open this large unoccupied territory to settlement.
In view of the road's traversing a comparative wilderness it
made a grant of enormous extent. Within the unoccupied ter-
ritory thus to be traversed there were, few settlers and few, if
any, land grants. It knew, therefore, that if the company pro-
ceeded promptly, as required, it would find within its place
limits nearly the full amount of its grant. It must be presumed
that Congress acted and would act in good faith, and, of course,
there could be no intent to deplete this grant to plaintiff by
subsequent legislation in respect to land grants. On the other
hand, it must be noticed that the grant to the State of Wis-
consin to aid in the construction of the road of the defendant
railway company was prior to that to the plaintiff, and also
that prior thereto the defendant had filed its map of definite
location. In passing the act of July 2, 1864, it is, therefore,
reasonable to suppose that Congress had in mind its earlier
grant, and did not intend that it should be diminished in any
manner thereby, but meant that the defendant railway com-
pany should receive either within its place or indemnity limits
the full amount of its lands. This, doubtless, was one of the
considerations which made the grant to the Northern Pacific
of so large an extent.

It may be well in concluding this opinion to again note the fact, already mentioned, that the withdrawal here considered was one in favor of an earlier grant. It may be that a different rule would obtain in case it was in favor of a later grant. As to place lands, it is settled that, in case of conflict, the title depends on the dates of the grants and not on the times of the filing of the maps of definite location. In other words, the earlier grant has the higher right. No scramble as to the matter of location avails either road, and it may be that the same thought would operate to uphold the title to the place lands of an earlier as against a withdrawal in favor of a later grant. Neither is it intended to question the rule that the title to indemnity lands dates from selection and not from the grant. All that we here hold is, that when a withdrawal of lands within indemnity limits is made in aid of an earlier land grant and made prior to the filing of the map of definite location by a company having a later grant — the latter having such words of exception and limitation as are found in the grant to the plaintiff — it operates to except the withdrawn lands from the scope of such later grant.

We see no error in the record, and the decree of the Court of Appeals is

*Affirmed.*