UNITED STATES v. CHICAGO, M. & ST. P. RY. CO. OF IDAHO.

(District Court, D. Idaho, N. D. April 1, 1913.)

1. WOODS AND FORESTS (§ 8*)—NATIONAL FOREST RESERVATIONS—ACQUISITION OF RIGHT OF WAY BY RAILROAD—"LANDS SPECIALLY RESERVED FROM SALE."

Lands within a national forest reserve are not subject to appropriation by a railroad company for right of way and other railroad purposes, under Right of Way Acts March 3, 1875, c. 152, 18 Stat. 482 (U. S. Comp. St. 1901, p. 1568), which by section 5 expressly excepts from its operation lands "especially reserved from sale."

[Ed. Note.—For other cases, see Woods and Forests, Dec. Dig. § 8.*]

2. WOODS AND FORESTS (§ 8*)—NATIONAL FOREST RESERVATIONS—RAILROAD RIGHT OF WAY.

Acts March 3, 1899, c. 427, § 1, 30 Stat. 1233 (U. S. Comp. St. 1901, p. 1584), providing that "in the form provided by existing law, the Secretary of the Interior may file and approve surveys and plats of any right of way for a wagon road, railroad or other highway over and across any forest reservation or reservoir site when in his judgment the public interest will not be injuriously affected thereby," whatever may be the extent or nature of the rights which it confers, unmistakably conditions the acquisition of any right upon the consent of the Secretary of the Interior.

[Ed. Note.—For other cases, see Woods and Forests, Dec. Dig. § 8.*]

3. WOODS AND FORESTS (§ 8*)—NATIONAL FOREST RESERVATIONS—TEMPORARY WITHDRAWALS OF LAND FROM SALE.

Acts March 3, 1891, c. 561, § 24, 26 Stat. 1103 (U. S. Comp. St. 1901, p. 1537), authorizing the President to set apart and reserve public lands as forest reservations, necessarily implies the authority, as a preliminary to such reservation, to make temporary withdrawals from sale of lands the reservation of which is in contemplation during the time of their examination and survey, and such withdrawals may legally be made through the appropriate departmental officers.

[Ed. Note.—For other cases, see Woods and Forests, Dec. Dig. § 8.*]

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

4. PUBLIC LANDS (§ 92*)—RIGHT OF WAY ACT—CONSTRUCTION.

Under Right of Way Act of March 3, 1875, c. 152, § 5, 18 Stat. 483 (U. S. Comp. St. 1901, p. 1569), which excepts from the operation of the act lands especially reserved, etc., the date upon which the status of the land is fixed is the time when the railroad company first seeks to give practical effect to the grant by the definite location of its line by the filing of its map of final location or actual construction, and not the time when it qualified itself as a grantee by filing its articles of incorporation.

[Ed. Note.—For other cases, see Public Lands, Cent. Dig. §§ 276–282; Dec. Dig. § 92.*]

5. SPECIFIC PERFORMANCE (§ 49*) — CONTRACTS ENFORCEABLE — AGREEMENTS WITH UNITED STATES.

Defendant railroad company surveyed its line over a national forest reservation, and filed its map of definite location with the Secretary of the Interior. Pending its consideration, in order to obtain permission to proceed with the construction of its road, its duly authorized attorney filed with the Department of Agriculture a paper by which it promised to enter into a stipulation, as nearly as practicable like one relating to another reservation, to take certain measures, etc., for the protection of the forests. After it had constructed its road it refused to sign the stipulation presented, and the Secretary of the Interior did not approve its map. *Held*, that the agreement was not without consideration, and that the United States, having acted on it, could maintain a suit in equity for its specific enforcement against defendant.

[Ed. Note.—For other cases, see. Specific Performance, Cent. Dig. §§ 140–151; Dec. Dig. § 49.*]

In Equity. Suit by the United States against the Chicago, Milwaukee & St. Paul Railway Company of Idaho. Decree for complainant.

C. H. Lingenfelter, U. S. Atty., of Boise, Idaho, and W. C. Henderson and H. H. Clarke, both of Missoula, Mont., for the United States.

F. M. Dudley, of Seattle, Wash., and H. H. Field, of Chicago, Ill., for defendant.

DIETRICH, District Judge. This is a suit in equity exhibiting a controversy between the United States and the Chicago, Milwaukee & St. Paul Railway Company of Idaho, primarily involving the question of the conditions under which a railroad company may acquire a right of way through lands embraced in a national forest. The right of way here in controversy is that claimed by the defendant through the Cœur d'Alene reserve, in the northern part of Idaho. In chronological order, the salient facts may be stated about as follows:

On March 21, 1905, the Commissioner of the General Land Office, by direction of the Secretary of the Interior, acting upon the request of the Secretary of Agriculture, temporarily withdrew from all disposal, except under the mineral laws, all of the lands which at a later date became the Cœur d'Alene National Forest. In January, 1906, the defendant company was organized for the purpose of constructing a railway, which, in part, was to extend across the lands so withdrawn. On February 17, 1906, the articles of incorporation and proofs of organization of the defendant company were accepted for filing,

and were filed by the Secretary of the Interior, and later in the same year, on November 16th, amendments thereto were accepted and filed. During the period from June 3, to October 13, 1906, the defendant's line of road was surveyed and staked upon the ground. On October 20, 1906, the route as thus selected was adopted by resolution of the defendant's board of directors. On October 23, 1906, maps of the defendant's road were filed in the local land office at Cœur d'Alene, Idaho, as required by the act of March 3, 1875, and the departmental rules, and upon the same day these maps were transmitted by the register to the General Land Office. On November 6, 1906, the Cœur d'Alene National Forest was created by proclamation of the President. On January 2, 1907, in response to an inquiry, the chief law officer of the Forest Service wrote a letter to counsel for the defendant, advising him of the practice in cases where applications were made for railroad rights of way in the national forests, from which it appears that it was customary for the Secretary of the Interior to call upon the Secretary of Agriculture to consider right of way applications over lands embraced within temporary withdrawals, and it was the view of the department that, if the reserve was actually created before the approval of the maps, the Secretary of Agriculture would have the right to demand from the railroad company, as a condition precedent to approval, a stipulation containing certain provisions for the protection of the forests. It was further explained in the letter that the applications of the defendant had not been approved, and that therefore the Forestry Service would be obliged to require such a stipulation. On March 18, 1907, the defendant, after making certain additional surveys, by resolution adopted a route different in some particulars from that shown upon its original maps. On March 20, 1907, maps exhibiting the newly adopted route were filed with the register of the land office at Cœur d'Alene, and forwarded to the General Land Office. On May 6, 1907, still another resolution was adopted making further changes in the route. On May 20, 1907, maps exhibiting this new route were filed with the register of the local land office, and transmitted to the General Land Office. In this connection it may be added that none of these maps has ever been approved by the Secretary of Agriculture or the Secretary of the Interior. On June 25, 1907, the register of the local land office at Cœur d'Alene, acting under instructions from the Commissioner of the General Land Office, returned to the railway company its maps filed on October 23, 1906, and on March 20, 1907, with the explanation that it was understood by the department that the maps of May 10, 1907, were intended to supersede the two earlier filings.

On May 10, 1907, one George R. Peck signed and filed with the United States Department of Agriculture, Forest Service, a writing which, in a measure, is the foundation of this suit, the same being as follows:

"Chicago, Milwaukee & St. Paul Railway Company of Idaho—Railroad (Interior). Cœur d'Alene National Forest, Idaho. United States Department of Agriculture. Forest Service.

"Whereas the Chicago, Milwaukee & St. Paul Railway Company of Idaho desires immediate permission from the Forest Service to begin construction of

the company's railroad in the Cœur d'Alene National Forest, Idaho, I hereby promise and agree on behalf of the company that it will execute and abide by stipulations and conditions to be prescribed by the forester in respect to said railroad; such stipulations and conditions to be as nearly as practicable like those executed by the company on January 18, 1907, in respect to its railroad within the Helena National Forest, Montana.

"Date May 10, 1907.            [Signed]        George R. Peck,

"General Counsel for the Chicago, Milwaukee & St. Paul Railway Company of Idaho."

On the same day—that is, on May 10, 1907—the following notation was indorsed upon this writing by the acting forester:

"Approved and advance permission given to construct, subject to ratification hereof by the company. Date May 10, 1907."

And it is to be added that thereafter, until October, 1907, at least, the government officers in good faith acted upon the assumption that the conditions of the writing were satisfactory to the defendant company.

On or about July 10, 1907, the defendant commenced the construction of that part of it road extending through the Cœur d'Alene National Forest, and completed the same on or about July 31, 1909. On or about October 24, 1907, a form of stipulation or contract, represented to be in accordance with the terms of the Peck agreement, was by the Forestry Service presented to the defendant for execution. On or about November 15, 1907, the defendant informed the forest supervisor that it would not sign such stipulation, but would await the outcome of certain negotiations which were pending at Washington with the officers of the Interior Department and the Department of Agriculture; the record does not disclose what reasons were assigned by the defendant for its declination to sign the proffered stipulation, but on or about December 2, 1907, Peck, acting for the defendant, personally advised the forester at Washington that he, Peck, was not authorized to make any different agreement in the case of the Cœur d'Alene National Forest than that which had been made for a right of way through the Yakima National Forest, and requested that the work of construction which was then being prosecuted should not be interrupted until the matter could be finally adjusted. Complying with this request, proper instructions were given to the subordinate officers of the Forestry Service to let the work proceed, and generally it may be said that while the officers of the government and its employés from time to time manifested their dissatisfaction with the attitude and conduct of the defendant, it was permitted to prosecute the work of construction to completion without molestation. On October 29, 1908, the Secretary of the Interior, after having given the defendant a specified time in which to execute the required stipulation, upon its default rejected its maps of definite location filed May 10, 1907, and struck the same from the files, for the reason, as stated, that the defendant refused to execute the required agreement for the protection of the forests. In the meantime, no settlement of the controversy having been reached, the plaintiff commenced this suit, on June 25, 1909, while construction work was still in progress.

The bill exhibits many of the facts hereinbefore set forth, and in

addition thereto it is averred that the defendant, in violation of law, and without right, cut the timber growing upon the strip of land claimed as a right of way, and in some instances upon land adjacent thereto, aggregating approximately 9,000,000 feet board measure. And it is further averred that at the time the bill was filed the defendant had cleared portions, and was clearing other portions, of the alleged right of way, for the purpose of constructing its railroad, and in the process of such clearing and construction it was destroying large amounts of small timber and young growth, and had thrown, and was throwing, and rolling, great quantities of rock, earth, gravel and débris in the St. Joseph river, a stream running through the National Forest, and by such obstructions the defendant was rendering the stream wholly unfit and useless for the purposes of navigation and logging. It is further alleged that, through lack of care and proper precaution, the defendant was causing fires to be started along the right of way, and large quantities of timber and young growth and seedlings were being burned. It is still further represented that, notwithstanding the warnings of representatives of the Forest Service, the defendant was continuing to engage in such unlawful acts, and was threatening to continue therein, and to commit waste and trespass upon such forest land, and that it was the intention and purpose of the defendant wholly to disregard the requirements of the Secretary of the Interior and the Secretary of Agriculture, and to decline to execute any agreement or stipulation, or to await the approval of its maps of definite location by the Secretary of the Interior.

The prayer is that the defendant be required to execute and file with the Secretary of the Interior the form of stipulation prescribed, a copy of which is set forth in the bill, and to refrain from obstructing the navigability of the St. Joseph river, and to refrain from cutting timber and constructing or operating its railroad until it shall have executed such agreement or stipulation, and until its maps shall be approved. Or, in the alternative, that the defendant be absolutely enjoined from constructing or operating its railroad upon any part of the Cœur d'Alene National Forest. There is the further prayer that damages be awarded.

[1] While they have been considered, it would be wholly impracticable to review in detail the multitude of questions embraced in the voluminous and able briefs which have been furnished by counsel, and in the main therefore I shall content myself with a discussion of those which are thought to be controlling. The fundamental question is the construction or interpretation to be given to the general right of way act of March 3, 1875 (18 Stat. 482, c. 152 [U. S. Comp. St. 1901, p. 1568]). The plaintiff contends that by its terms it has no application to lands reserved as a national forest, and the defendant, maintaining the contrary view, takes the position that at the date of the Peck agreement it had acquired, or was entitled to acquire, the right of way in dispute without let or hindrance on the part of the Secretary of the Interior or the forestry officials, and that therefore, even if it be conceded that the agreement was properly and authoritatively executed, it was wholly without consideration, a mere nudum pactum,

and for that reason void and unenforceable. It is thought that the government's contention must be sustained. Section 1 of the act purports to grant to qualified corporations a "right of way through the *public lands* of the United States," and by section 5 it is provided that it shall not apply "to any lands within the limits of any military, park, or Indian reservation, or other lands specially reserved from sale." The phrase "public lands" is without precise technical significalion (United States v. Blendaur, 128 Fed. 910, 63 C. C. A. 636; United States v. Minidoka & S. W. R. Co., 190 Fed. 491, 111 C. C. A. 323), and section 5 was doubtless added for the purpose of excluding the possibility that the act would be so construed as to affect publicly owned lands embraced in the classes of reservations specifically named, or otherwise "specially reserved from sale." Clearly, if the language is to be given its ordinary import, lands withdrawn from entry by executive proclamation, and set apart as a forest reserve, are "lands specially reserved from sale," and no valid reason is apparent why its meaning should be limited, or, by resort to a strained construction, we should exclude this class of reservations from its operation. In some of its features the "right of way act" is out of harmony, and is incompatible with the general object and purpose of the forestry laws. It is true that the public interests may, and generally will, be subserved by the construction and operation of railways through national forests; they make more available for use the products of the forest, and in case of emergency, where fires have been started, they may be of the greatest service in facilitating communication and transportation. But upon the other hand, unless the representatives of the public interest are authorized to exercise some control over the location of the lines of such roads and the manner in which they shall be constructed, and shall have the power to require precautions to be taken against loss by fire, always a peril incident to the use of coal-burning locomotive engines, the railroad may become more of a menace than a benefit. Moreover, if the act is applicable at all, it must be held to be applicable in its entirety, and therefore if a railway company is entitled to appropriate as its right of way a strip of land 200 feet wide, upon such line as it may see fit, through a forest reserve, it may also take to the amount of 20 acres for station purposes, to the extent of one station for each 10 miles of road, and it may likewise cut from the lands adjacent to the right of way such timber as may be required for the construction of its road—all of which rights are expressly conferred by the act. It is not impossible to conceive conditions where, if such be the absolute and unrestricted rights of the railway company, the usefulness of a small forest reserve for the purpose for which it was intended may be greatly impaired, if not wholly destroyed.

It may be added that apparently the view that forest reserves are not subject to the operation of the act of 1875 was entertained by Congress, for we find that during the period following the passage of the original forest reserve act (March 3, 1891, 26 Stat. 1103, c. 561, § 24 [U. S. Comp. St. 1901, p. 1537]), and prior to the right of way legislation of March 3, 1899, next to be considered, several special acts

were passed for the purpose of granting railroads a right of way across forest reserve lands. See, for example, Act of May 28, 1896, 29 Stat. 190, c. 257; Act of June 6, 1896, 29 Stat. 253, c. 336; Act of May 18, 1898, 30 Stat. 418, c. 343; Act of February 28, 1899, 30 Stat. 910, c. 223.

[2] In the general deficiency act of March 3, 1899, 30 Stat. 1219, 1233, c. 427, § 1 (U. S. Comp. St. 1901, p. 1584), is found the following isolated paragraph:

"That in the form provided by existing law the Secretary of the Interior may file and approve surveys and plats of any right of way for a wagon road, railroad, or other highway over and across any forest reservation or reservoir site when in his judgment the public interests will not be injuriously affected thereby."

The language of this remarkable provision is truly cryptic in its obscurity, and is perhaps susceptible to any one of three or more different constructions. In the view put forward by the government, the reference to "existing law" operates only to adopt the forms and procedure prescribed by, and carries forward nothing of the vitality of, such laws. But apparently under such a literal reading the measure becomes meaningless, for the mere approval of maps and surveys is in itself an idle and useless thing to do. The paramount and only important consideration is the force or effect of such approval, and upon that question not only is the provision entirely silent, but light can be drawn neither from the title of the act in which it is found nor from its context. Let us suppose that the "existing law" simply prescribed forms of procedure, and conferred no right; the provision in itself contains no words of grant, and upon what theory then could it be contended that the Secretary's approval would operate to effect a grant or confer any right whatsoever? It would therefore seem that, to render the enactment effective for any real purpose, it becomes necessary, not only to import the forms and procedure, but also a measure at least of the potency and effect signified thereby in the system from which they are borrowed.

In another view the provision operates to carry forward and make applicable to forest reserves the whole of the act of 1875. It is not impossible that Congress, taking cognizance of existing doubts touching both the application of and the discretionary power of the Secretary of the Interior under the general act, intended thus to clear up both doubts, by declaring it to be applicable to forest reserve lands, with the added restriction that in no case could a grant be effected without the consent of the Secretary of the Interior. The objection to this construction is that under it there are carried forward certain provisions of the general act which, as we have already stated, are thought to be out of harmony with the spirit, and incompatible with the purpose, of the forestry laws, a view which apparently Congress entertained, for in each of the special right of way acts above referred to, passed shortly before the enactment of this provision, while the general act of 1875 is adopted and made applicable as a whole, there is expressly excepted from the privileges conferred thereby the right to take timber from adjacent lands.

Still another view, and I am inclined to think a better one, is that the provision extends only to what may be strictly called the right of way features of the act of 1875, to the exclusion of other rights and privileges thereby conferred, and that in the express adoption of the forms and procedure in that act prescribed, and the authorization of the Secretary of the Interior at his discretion to file and approve maps and surveys tendered in conformity therewith, there is necessarily implied the intent that such approval shall operate to consummate a right of way grant, such as would be effected by a like approval of similar plats and surveys upon public unreserved lands under the act of 1875. There is no substantial difficulty in limiting its operation to the right of way feature, for in terms it purports to relate to no other subject or privilege.

However at this juncture an extended discussion of these several theories is unnecessary, for the reason that in no view of its doubtful features can the act of 1899 be made to avail the defendant. Whether it be construed as being substantively independent of the act of 1875, or as adopting it in part, or as making it in all respects applicable to forest reserves, and whatever may be the nature or extent of the rights which it confers, it unmistakably conditions the acquisition of any right upon the consent of the Secretary of the Interior, and, such consent having here been withheld, it is without efficacy as a defense.

[3] We now come to the consideration of the important question, what, if any, rights the defendant acquired in these lands prior to their reservation, and while they remained subject to the operation of the act of 1875. The order of the Commissioner of the General Land Office, temporarily withdrawing the lands from entry and sale, antedated the defendant's organization, and it follows that if the order was valid, there is no possible ground upon which it can be held that by the subsequent filing of the articles of incorporation and proofs of organization, and, later, maps of definite location, any right whatsoever was perfected or even initiated; and I am inclined to the view that the validity of the order must be sustained. In the present inquiry it is all the time to be borne in mind that the issue here arises, not between the defendant and a third person, each claiming priority of right to land which the government is willing to convey to the one showing the better right, but between the defendant and the government itself, and the question therefore is whether and when the defendant became vested with any interest which the government is bound to respect. Royal Packing Co. v. United States, 199 U. S. 579, 26 Sup. Ct. 159, 50 L. Ed. 316; Stalker v. Oregon S. L. R. R. Co., 225 U. S. 142, 32 Sup. Ct. 636, 56 L. Ed. 1027.

These were public lands wholly free from private claims, and subject to the control and disposition of the plaintiff, both as proprietor and sovereign. By general law it had established the policy of reserving from entry and sale portions of its forest-bearing lands, and had invested the President with the authority from time to time to establish reservations, and to fix and declare the boundaries thereof. Intelligently to exercise this authority and to give effect to the ex-

pressed will of Congress, it became necessary to make preliminary investigations, including surveys, for 'the purpose of determining whether or not the lands in any given locality were of such character that they fell within the terms of the act, and of preparing a proper description for their identification. Now it cannot be doubted that while this preliminary work is going on the lands under investigation must be held exempt from private entry, for otherwise, upon its becoming known that the creation of a forest reserve is in contemplation, the project may be greatly hampered, if not wholly frustrated, by the initiation, through private entry, of claims to valuable and salient portions thereof. Hence the temporary withdrawal here was in aid of and incidental to the permanent reservation which the President was empowered to make, and it should therefore be held that the power to proclaim the reservation necessarily implied the authority to declare the withdrawal. It thus appears, and the consideration is emphasized, that here the withdrawal was not made merely or primarily to prevent private entry, but for the ultimate purpose of enabling the President fully to accomplish the object of a statute to which it was his duty to give practical effect; the action was taken, not capriciously or arbitrarily, but "in furtherance of a public purpose committed by Congress to the Executive to effectuate." The following authorities, while not involving the precise question, upon principle lend support to this view: Wilcox v. Jackson, 13 Pet. 498, 10 L. Ed. 264; Wolsey v. Chapman, 101 U. S. 755, 25 L. Ed. 915; Grisar v. McDowell, 6 Wall. 363, 18 L. Ed. 863; Wolcott v. Des Moines Co., 5 Wall. 681, 18 L. Ed. 689; Hamblin v. Western Land Co., 147 U. S. 531, 13 Sup. Ct. 353, 37 L. Ed. 267; Northern Pacific Ry. Co. v. Musser-Sauntry L., L. & Mfg. Co., 168 U. S. 604, 18 Sup. Ct. 205, 42 L. Ed. 596; Spencer v. McDougal, 159 U. S. 62, 15 Sup. Ct. 1026, 40 L. Ed. 76; Bullard v. Des Moines, 122 U. S. 167, 7 Sup. Ct. 1149, 30 L. Ed. 1123; United States v. Payne (D. C.) 8 Fed. 883; John M. Kane, 37 Land Dec. Dept. Int. 277; George Herriott, 10 Land Dec. Dept. Int. 513; John Campbell, 6 Land Dec. Dept. Int. 317; 17 Op. Attys. Gen. 258. The fact that the withdrawal was provisional and temporary in its character does not materially alter the case. United States v. Grand Rapids, etc., R. R. Co. (C. C.) 154 Fed. 131. It ripened into a permanent reservation which should be held to relate back to the initiatory act.

The further point is urged that only the President has the authority to establish forest reserves, whereas here the withdrawal appears to rest solely upon an order of the Commissioner of the General Land Office; but the order was in accordance with the express direction of the Secretary of the Interior, whose acts are in the premises to be deemed those of the President. Wilcox v. Jackson, 13 Pet. 498, 10 L. Ed. 264; Wolsey v. Chapman, 101 U. S. 755, 769 (25 L. Ed. 915). In the former case it was said:

"Now, although the immediate agent, in requiring this reservation was the Secretary of War, yet we feel justified in presuming that it was done by the approbation and direction of the President. The President speaks and acts through the heads of the several departments in relation to subjects which

appertain to their respective duties. * * * Hence, we consider the act of the War Department, in requiring this reservation to be made, as being in legal contemplation the act of the President."

In the latter case, in response to the objection that a *proclamation* by the President is a prerequisite, and that a mere *order* of a departmental officer is not the equivalent thereof, the court said:

"A proclamation by the President, reserving lands from sale, is his official public announcement of an order to that effect. No particular form of such an announcement is necessary. It is sufficient if it has such publicity as accomplishes the end to be attained. If the President himself had signed the order in this case, and sent it to the registers and receivers who were to act under it, as notice to them of what they were to do in respect to the sales of the public lands, we cannot doubt that the lands would have been reserved by proclamation within the meaning of the statute. Such being the case, it follows necessarily from the decision in Wilcox v. Jackson that such an order sent out from the appropriate executive department in the regular course of business, is the legal equivalent of the President's own order to the same effect. It was therefore, as we think, such a proclamation by the President, reserving the lands from sale, as was contemplated by the act."

But if we assume that the preliminary withdrawal was unauthorized by law, and therefore ineffectual for any purpose, what, if any, rights did the defendant have at the time of the execution of the Peck agreement? In that view the lands remained public and unreserved until November 6, 1906, the date of the President's proclamation. Prior to this time, namely, upon February 17, 1906, the defendant's articles of incorporation and proofs of organization were accepted and filed by the Secretary of the Interior; it is thought to be unimportant that amendments thereto were made subsequent to the proclamation. Defendant's first map was filed before, and the other two after, the date of the proclamation. I am inclined to the view that the first and second filings must be disregarded, and that May 22, 1907, the date of the last one, is to be taken as the date of the filing of defendant's map of definite location, under the act of 1875. Both the second and third maps purport to be, not amendments to the first map, but amended maps, and the routes exhibited are far from being substantially identical. Indeed the lines shown upon the first and last are distinct for the larger part of the distance across the reservation, and for long stretches the two routes are separated by many miles of intervening territory. Upon receipt of the last map the other two were returned to the defendant, with the explanation that it was understood that they were superseded by the last one, and, so far as the record shows, no objection was at the time raised, and apparently the defendant acquiesced in this view of the case. But for practical purposes it is quite immaterial whether we consider only one or all three of the maps. Surely, in view of the wide divergence of the several routes, it cannot be held that the last filing relates back to the first. And hence, if the question of whether the filing was before or after the reservation was established by proclamation is of controlling importance in determining the rights of the defendant, so much of the route finally adopted and actually used in the construction of the road is covered only by the later filings, that if, as to this portion, it is without legal right, and if therefore, as to such portion, it may be required either to remove its track or submit to conditions and terms to be im-

posed by the Secretary of the Interior, it would be without effective defense to the relief prayed for, even were it to be held that its right to the other portion—that covered by the earliest filing—is well founded in law. Upon that assumption, the Peck agreement could not be held to have been without consideration; or, if such agreement may be wholly disregarded, the Secretary of the Interior could impose, as a condition to the approval of the defendant's last filing, terms substantially as now demanded.

[4] Assuming then that defendant's articles of incorporation and proofs of organization are to be deemed to have been accepted and filed before, and its map of definite location after, the creation of the reserve, did it acquire a right of way under the act of 1875? Relying upon a rule of law enunciated notably in the case of Railroad Co. v. Baldwin, 103 U. S. 426, 26 L. Ed. 578, the defendant argues that the act is a grant in præsenti, although upon its face uncertain both as to the grantee and as to the lands affected by the grant; that upon the filing by the defendant, and the acceptance thereof by the Secretary of the Interior, of its articles of incorporation and proofs of organization, the grantee became identified, and thereafter the defendant was to be regarded as having the same status under the act that it would have had if it had been specifically named as a grantee therein, and therefore it at once became vested with a right of way across the public lands in Idaho within the general boundaries designated in its articles of incorporation; and that while at that date the grant was a floating one, and had still to be defined either by the filing of a map of definite location or by the actual construction of the road, it constituted a vested right of which the defendant could not be divested by any subsequent change in the status of lands which were at that date public and unreserved. In other words, the contention is that the defendant's rights are precisely the same as they would have been if, upon February 17, 1906, while the lands in question were public and unreserved, Congress had passed an act naming it as grantee, and presently granting to it a right of way 200 feet wide through such lands, and that therefore any subsequent disposition of the lands was necessarily subject to such right of way—as was held in the Baldwin Case. If section 1 were the whole of the act, the correctness of this position could not well be controverted, but by other provisions the grant is brought into closer analogy to the "land-grant" feature than the "right of way" feature of the act considered in the Baldwin Case, and while, therefore, as was there said concerning the land grant, the words used in the first section import an immediate transfer of interest, so that when the route is definitely fixed the title attaches as of the date the railroad corporation becomes a qualified grantee, the grant does not operate to affect lands which in the meantime have, by change of status, ceased to be public, or have fallen into one of the excepted classes enumerated in section 5. The language of this section is:

"That this act shall not apply to * * * any land specially reserved from sale."

And it is thought that the date as of which the status or character of the land is in all cases to control is the time when the railroad company first seeks to give practical effect to the grant by the definite location of its line of road, whether that be by the filing of the statutory map or by actual construction upon the ground.   The view finds support in the following cases:  Spokane, etc., R. R. Co. v. Ziegler, 61 Fed. 392, 9 C. C. A. 548, affirmed 167 U. S. 65, 17 Sup. Ct. 728, 42 L. Ed. 79;  United States v. Minidoka, etc., R. R. Co., 190 Fed. 491, 111 C. C. A. 323;  Minneapolis, etc., R. Co. v. Doughty, 208 U. S. 251, 28 Sup. Ct. 291, 52 L. Ed. 474;  Stalker v. Oregon Short Line R. R. Co., 225 U. S. 142, 32 Sup. Ct. 636, 56 L. Ed. 1027—and it is not in conflict with Jamestown, etc., R. R. Co. v. Jones, 177 U. S. 125, 20 Sup. Ct. 568, 44 L. Ed. 698, considered in the light of these more recent decisions.   It must be borne in mind that the act is without limit as to either time or place, and in our effort to discover the legislative intent some regard must be had for the possible results in practice of the adoption of any given theory.   For instance, it is provided that any section of a railroad must be completed within five years after the location of the route thereof, and forfeiture of rights is imposed as a penalty for default; but there is no limit of time for either commencing or completing construction, from the date of the filing of the articles of incorporation and due proofs of organization, and therefore, if the theory for which the defendant contends is to prevail, it will follow as of course that any "promoting" company may, at a nominal expense, be organized, and, by filing with the Secretary of the Interior the requisite papers, it can pre-empt a "floating" right of way, or, for that matter, any number of them, and hold them an indefinite length of time for speculative purposes.   Not for light reasons should it be held that Congress intended that private persons who desire to purchase and improve portions of the public lands, and the government itself in the execution of its plans for the conservation of its natural resources, should be compelled to proceed with the consciousness that at any moment they may be dispossessed of the most cherished part of their belongings by the definite location of one or more of such "floating" grants.

The following often-quoted passage from the opinion in Noble v. Union River L. R. Co., 147 U. S. 165, 176, 13 Sup. Ct. 271, 274 (37 L. Ed. 123), is set forth in defendant's brief, and relied upon as establishing a rule in support of its view:

"The language of that section (section 1) is 'that the right of way through the public lands of the United States is hereby granted to any railroad company duly organized under the laws of any state or territory,' etc.   The uniform rule of this court has been that such an act was a grant in præsenti of lands to be thereafter identified.   Railway v. Alling, 99 U. S. 463 [25 L. Ed. 438].   The railroad company became at once vested with the right of property in these lands, of which they can only be deprived by a proceeding taken directly for that purpose."

But the only question which the court was there considering was whether or not the Secretary of the Interior could vacate the approval by his predecessor of the railroad company's map of definite

location, and thus nullify the grant. Moreover, the immediate context of the passage quoted is as follows:

"The lands over which the right of way was granted were public lands subject to the operation of the statute, and the question whether the plaintiff was entitled to the benefit of the grant was one which it was competent for the Secretary of the Interior to decide, *and when decided, and his approval was noted upon the plats, the first section of the act vested the right of way in the railroad company.*"

It thus appears that the phrase "became at once vested" was used by the court in relation to the time, not when the railroad company filed its articles of incorporation and due proofs of organization, but when the Secretary of the Interior approved the maps of definite location and such approval was noted upon the plats.

If the foregoing views are correct, the defendant acquired no rights under the act of 1875; and it being plain that under the act of March 3, 1899, a grant is conditioned upon the precedent approval of the Secretary of the Interior, which the defendant has failed to obtain, the conclusion follows that it is without any right other than such as it may have obtained by reason of its execution, and the government's approval and acceptance, of the Peck agreement.

[5] And this brings us to a consideration of the question whether, under the circumstances, the plaintiff may be granted any relief in a suit in equity. Primarily the prayer is for the specific performance of the Peck agreement, to which relief the defendant interposes several objections. It is first said that equity will not enforce an agreement to make an agreement; but this rule is not without important exceptions, notably in cases where the agreement is for the execution of formal contracts of security, or contracts of insurance and indemnity, or contracts affecting the title to, or possession of, lands. 36 Cyc. 567.

It is next contended that when he signed the agreement Peck was laboring under a mistake as to the relative dates of the order of withdrawal and the President's proclamation upon the one hand, and the defendant's filings upon the other. Assuming, without deciding, that such an extraordinary mistake was made, it should not be held to defeat the plaintiff's prayer. In the first place, it related to a condition upon which, as we have already seen, the legal rights of the parties in no wise depended, and the defendant's claim to a right of way was quite as much without legal validity in one view of the facts as in the other. But aside from that consideration, the dates should have been known by the defendant, if not as a matter of law, then by reasonable diligence as a matter of fact. They were of public record at the very place where the agreement was executed, and could have been ascertained upon the most casual examination. If the defendant through its own neglect failed to inform itself, it cannot now successfully interpose its ignorance as a reason why it should not discharge the obligations of an agreement the benefit of which it has taken, and surely not without returning the consideration which it has received. The obligations of the agreement are not harsh or unconscionable, but are only such as the Secretary had the legal right to impose, and such as the defendant was bound to assume as a condition of its securing a right of way, and which, with a knowledge of all the facts, it doubt-

less would have assumed in order to avoid delay in the prosecution of the construction of its road.

Uncertainty of the agreement is also urged as a ground for denying specific performance, but it is not thought that any serious difficulty is encountered under this head.

The defense that equity will decline to decree the specific performance of a continuous duty is without merit, for the decree here may, with propriety, go only to the extent of compelling the defendant to execute the required stipulation; relief for any subsequent violations or threatened violations of such stipulation is a matter for future consideration.

Finally, it is contended that the agreement is lacking in mutuality. In so far as there is any substance to the point, it is based upon the limited capacity of the government officers to enter into binding contracts, and upon the exemption of the sovereign from the compulsion of judicial process. It cannot be successfully urged that the agreement was not fully executed by the defendant. Peck was delegated to represent it in the negotiations for the desired right of way, and he acted within the scope of his authority. The notation made by the acting forester, to the effect that acceptance was "subject to ratification" by the company, was for the benefit of the plaintiff, and could be waived by it. But ratification is to be presumed from the subsequent conduct of the defendant, in that it failed to repudiate the known act of its agent within a reasonable length of time, and it accepted, during a period of many months at least, the benefit and protection of the agreement.

It is true that a claim is made that the company was not advised of the Peck agreement until some time in October, 1907, but, while certain officers of the company may have remained in ignorance, under the circumstances of the case as shown by the record it is wholly incredible that Peck failed to report the results of his mission to any one, and that no curiosity was aroused as to how it came about that the known opposition of the forestry officials to the occupation by the defendant of a right of way suddenly ceased. Moreover, there never was any express or clear repudiation of the Peck agreement, and we find that as late as December, 1907, while declining at that time to sign a form of stipulation tendered by the government officers, the defendant, instead of electing to stand solely upon its alleged legal rights, requested as a favor that the matter be left open for further negotiations, and that in the meantime it be permitted without interruption to prosecute its construction work, with the implied understanding, as must be inferred, that it would make proper adjustment. If Peck was without authority, or if the defendant was unwilling to be bound by the agreement, why did it not promptly and openly repudiate it, instead of thus temporizing until it had in its possession every advantage which the agreement was intended to secure? Can it for a moment be supposed that the government would have stayed its hand, if the defendant's representatives had at that time intimated that, even though it should ultimately be concluded that under the law it had no right upon the reservation without the consent of the

Secretary of the Interior, it would refuse to abide by the Peck agreement, and that, as it is now doing, it would put forward, as a defense to any relief which might be sought, the very possession which it was asking as a favor to be permitted to take and hold without molestation? The only proper construction that can be put upon what then occurred is that both parties understood that the agreement would control, unless they should be able to reach some other arrangement mutually satisfactory.

It is undoubtedly a general rule that the specific performance of a contract will not be decreed against one party unless it is capable of being enforced against the other (Marble Co. v. Ripley, 10 Wall. 339, 359, 19 L. Ed. 955; Pantages v. Grauman, 191 Fed. 318, 323, 112 C. C. A. 61), but the rule is subject to numerous exceptions. Indeed, in the last edition of Pomeroy on Equity Jurisprudence (Equitable Remedies), vol. vi, § 769, the learned author says:

"The frequent statement of the rule of mutuality—'that the contract, to be specifically enforced, must as a general rule be mutual, that is to say, such, that it might, at the time it was entered into, have been enforced by either of the parties against the other'—is open to so many exceptions that it is of little value as a rule."

Thereupon the author states what he conceives to be the extent of the modern rule, as follows:

"If at the time of the filing of the bill in equity, the contract being yet executory on both sides, the defendant, himself free from fraud or other personal bar, could not have the remedy of specific performance against the plaintiff," then the contract is lacking in mutuality.

But here it appears that the government has substantially performed its part of the agreement, and, having voluntarily submitted itself to the jurisdiction of the court, it or its authorized officers can be required to file and formally approve the defendant's maps as a condition to the delivery of the executed stipulation, for which it prays.

"The rule (of mutuality) governs only such contracts as are executory; for when the party who is not bound has performed his part under the contract, even though not legally bound to such performance, the plea of want of mutuality cannot be made." 22 Am. & Eng. Enc. of Law, 1020.

"If plaintiff has performed his unenforceable promise, the fact that before such promise there was a lack of mutuality in the remedy is no defense." 36 Cyc. 631.

In Mississippi Glass Co. v. Franzen (C. C. A. 9th Cir.) 143 Fed. 501, 74 C. C. A. 135, 6 Ann. Cas. 707, it was said:

"The doctrine of nonenforceability in equity of a contract for lack of mutuality has no application to an executed contract. Green v. Richards, 23 N. J. Eq. 32, 35; Hulse v. Bonsack Machine Co., supra (65 Fed. 864, 13 C. C. A. 180); Grove v. Hodge, 55 Pa. 504, 516. In the last-cited case the court, speaking by Judge Strong, said: 'Want of mutuality is no defense to either party, except in cases of executory contracts. It has no applicability to an executed bargain. There are many where the obligation is all upon one party. As to one the obligation was fulfilled, the contract was executed, when it was made. As to the other party, it remained executory. A consideration may be either something done, or something to be done, or a promise itself. When it is something already done, it is idle to talk of want of mutuality. That is to be considered only when the obligations of both parties are future.' "

See, also, Louisville, etc., R. Co. v. Flanagan, 113 Ind. 488, 14 N. E. 370, 3 Am. St. Rep. 674.

In conclusion, upon this branch of the case, it should be added that in the absence of insurmountable obstacles this form of relief should be adopted, for in the alternative the defendant must submit either to process of ejectment or an injunctive order restraining it from maintaining or operating its railway within the boundaries of the forest reserve. Putting aside all consideration of the consequences to the defendant itself, only for the most cogent reasons should the court resort to either of these courses, fraught, as of necessity it would be, not only with great inconvenience to the public, but with irreparable loss to private persons who have valuable property rights, growing out of the construction, and dependent upon the maintenance and operation, of the road. No such imperative reasons appear, and the defendant will therefore be required specifically to perform its agreement. Price v. Mayor, etc., of Penzance, 4 Hare, 506; Fry on Specific Performance, § 83; Lane v. Pac., etc., R. R. Co., 8 Idaho, 230, 67 Pac. 656.

Two other branches of the case remain for disposition, but they are incidental. and I have decided to postpone their consideration to a later date. The one is the precise form of the stipulation which the defendant shall be required to sign, and the other is the amount of damages, if any, which shall be awarded. There is in the record a form of stipulation which the plaintiff desires to have signed, but apparently in material respects it differs from the Helena stipulation, to which reference is made in the Peck agreement, and which it is thought must control the stipulation here. In the briefs little attention is given to this feature of the case, and it has occurred to me that in view of the conclusion here that the defendant will be required to execute a stipulation, counsel can agree upon the form thereof. On the part of the plaintiff it must be borne in mind that it has come into court seeking the enforcement of a specific agreement, and it follows that it must submit to being bound thereby. As a suitor its status is substantially that of a private litigant. United States v. Detroit Lumber Co., 200 U. S. 321, 339, 26 Sup. Ct. 282, 50 L. Ed. 499; Mountain Copper Co. v. United States, 142 Fed. 625, 73 C. C. A. 621; United States v. Grand Rapids, etc., R. R. Co. (C. C.) 154 Fed. 131, 136. It may be that the Secretary of the Interior would have had the right to impose upon the defendant all of the conditions specified in the form which has been furnished, but the question here is not what might have been required, but what was required, and the only obligation imposed upon the defendant was that it should execute a stipulation "as nearly as practicable" like the one of January 18, 1907, relating to the Helena national forest; and hence that stipulation must here be the guide. At least in so far as the record informs us, there is no question of the "practicability" of charging the defendant at the same rate for timber used by it upon this forest, as was charged in the case of the Helena forest, but in the form here furnished a higher rate is specified. I also note a difference in the width of the space to be cleared outside of the right of way. It is possible, however, that this

provision is not onerous to the defendant, and it makes no objection thereto. The form also contains some entirely new provisions. If counsel cannot agree, each side is invited to furnish a draft as nearly like the Helena stipulation as is deemed to be "practicable," with a brief summary of the reasons why in any particular respect there should be any deviation.

Inasmuch as the question of damages may, under some contingencies, be dependent upon the contents of the stipulation which shall finally be required, and upon the attitude of the parties relative thereto, it will be passed for the present.

The parties may have 20 days in which either to agree upon the form of stipulation or to furnish drafts embodying their respective views, as above suggested.